■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v

RANDY DUBOIS, Appellant

On March 31, 1983, a codefendant implicated the defendant in a robbery and murder that had occurred in a social club on March 27, 1983. Detective William Glynn, who was investigating the crime, prepared a photo array containing the defendant's picture which he separately displayed to two eyewitnesses. They both selected the defendant as the light-skinned, black male who had been holding a knife during the robbery. Glynn obtained a copy of the defendant's arrest record which revealed that in October 1982, he had been twice arrested for separate misdemeanor charges. The record did not show any disposition for these charges so Glynn contacted the courts in which the cases would have been pending but was not able to obtain any information. Glynn also learned that the defendant had used 408 West 128 Street as a prior address. He proceeded to this building and spoke to a Debra Jackson who admitted that the defendant had been living with her but had moved out about two months before and was not expected to return.

In the ensuing months Glynn returned to the address at 128 Street several times hoping to obtain information or locate the defendant. The detective never obtained an arrest warrant. On March 10, 1984, Glynn again visited Debra Jackson's apartment. When he knocked at the door a male voice asked who was there. Glynn identified himself as a police officer and said that he wanted to speak with Ms. Jackson. The defendant then opened the door. Although Glynn recognized him immediately, he asked the defendant to identify himself. The defendant gave a fictitious name and Glynn asked if he could speak to him. The defendant agreed at which point Glynn stepped into the apartment and placed him under arrest.

The defendant was then transported to the 73rd Precinct where he was advised of his rights. Glynn then informed him that a codefendant had implicated him in the crime, after which the defendant made a voluntary statement incriminating himself. Shortly thereafter Glynn arranged a lineup which was viewed by the two witnesses who were previously shown

the photo array. They both selected the defendant as one of the perpetrators. At about 2 A.M. the next morning the defendant met with an Assistant District Attorney, who again advised him of his rights, after which the defendant made a videotaped confession.

The defendant sought suppression of his statements and lineup identification as the fruits of an illegal arrest since Glynn did not have a warrant when the defendant was arrested in his apartment. Alternatively he sought suppression of his statements claiming that they were taken in violation of his right to counsel since Glynn was aware that there were charges pending against him at the time of his arrest. He further contended that any in-court identifications by the two witnesses should be suppressed because both the photo array and lineup, which they viewed, were unduly suggestive. The court denied all branches of the omnibus motion which sought suppression.

The hearing court found that the defendant's warrantless arrest was legal because exigent circumstances allowed Detective Glynn to enter the defendant's apartment. The court reasoned that once the defendant opened his door Glynn knew he was in the apartment and could reasonably believe that he was armed and would attempt to escape if Glynn were to leave and obtain an arrest warrant. We cannot agree. It would have been unreasonable for Glynn to believe that because the defendant had wielded a knife during the robbery, that he was still armed almost a year later. Although on the record before us, after considering all of the relevant factors, we cannot find that exigent circumstances existed, the record does support a finding that by his actions the defendant consented to Glynn's entry into the apartment *(see, People v Davis,* 120 AD2d 606, *lv denied* 68 NY2d 769; *People v Taylor,* 111 AD2d 520, *lv denied* 66 NY2d 618). It was therefore not necessary to suppress the defendant's statements or lineup identifications because of his warrantless arrest. However even if the defendant had not consented to the detective's entry the record fully supports a finding that any taint caused by the arrest had been attenuated by the time the defendant gave his statement and was placed in the lineup *(see, People v Conyers,* 68 NY2d 982; *People v Sanders,* 122 AD2d 86, *lv denied* 69 NY2d 717; *People v Davis, supra).*

The defendant next contends that his statements should be suppressed because they were taken in violation of his right to counsel, since Detective Glynn was aware that there were prior charges pending against him *(see, People v Bartolomeo,*

53 NY2d 225; *People v Bertolo,* 65 NY2d 111). The record reveals that Glynn received a report which indicated that the defendant had been arrested on misdemeanor charges approximately six months before the present crime was committed. In or about April 1983 when he reviewed this report, Glynn could obtain no information about these charges. He was therefore unsure if these minor charges were still pending. "[W]here the police have actual knowledge that a defendant has a prior unrelated charge pending against him, they are obligated to inquire whether the defendant has counsel in that case, and a failure to conduct such an inquiry would render them chargeable with whatever information it would have disclosed *(People v Bartolomeo,* 53 NY2d 225). However, absent actual knowledge of the pendency of prior charges, the police have no affirmative duty to cease their questioning or inquire whether the defendant has an attorney *(People v Bertolo,* 65 NY2d 111, 119), and the critical analysis centers upon whether the circumstances warrant imputation of knowledge of the pendency of the charges *(People v Bertolo, supra,* at p 118). 'The most salient of these are: the extent of the police knowledge; the proximity, severity and notoriety of the prior charges; and the good or bad faith of the police' *(People v Bertolo, supra,* at p 118)" *(People v Jacobs,* 119 AD2d 695, 696-697, *lv denied* 68 NY2d 668). When Glynn arrested the defendant in March 1984 he had no actual knowledge that the prior charges against defendant were still pending and considering their " 'remote[ness] in time' " as well as their "minor" nature Glynn "was entirely justified in entertaining a good-faith belief that the prior charges had been disposed of" *(People v Jacobs, supra,* at 697).

The photo array viewed by the two eyewitnesses was not unduly suggestive although four of the photographs were of men with noticeably darker skin tone than the defendant. However the pictures of the defendant and one other subject were remarkably similar in skin tone and facial features. The array was therefore not so suggestive that the witnesses' attention was drawn to only one subject *(see, People v Rudan,* 112 AD2d 255; *People v Hall,* 81 AD2d 644; *People v Shea,* 54 AD2d 722). Having independently reviewed the photographs of the lineup procedure, we are in full agreement with the hearing court that it was fair. Even if the photo array was suggestive, the almost 12-month interval between the photographic identification and the lineup sufficiently attenuated the two identifications so as to remove any taint *(see, People v Allen,* 134 AD2d 598; *People v Watts,* 130 AD2d 695, *lv denied*

70 NY2d 718). Moreover the record amply supports a finding that both witnesses had a substantial independent basis for their identifications. Mangano, J. P., Thompson, Sullivan and Harwood, JJ., concur.