■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALVIN ENTZMINGER, Appellant.—Judgment, Supreme Court, New York County (Jacqueline Silbermann, J.), rendered November 25, 1986, which convicted defendant, after jury trial, of murder in the second degree and sentenced him to a prison term of 25 years to life, consecutive to prison time owed for a previous felony conviction, unanimously affirmed.

Police discovered the body of Florence Bour inside her apartment on the afternoon of January 10, 1986. The victim had been beaten repeatedly, and the Medical Examiner at the scene determined that she died sometime between the late afternoon of January 9 and the early morning of January 10. The investigating detectives learned that defendant, a parolee, was employed by a "Meals on Wheels" program to deliver meals to senior citizens, and that he regularly visited Mrs. Bour on his route. The detectives decided to question defendant and proceeded to his apartment between 6:30 and 7:00 P.M. on the evening of January 10.

Detectives Lachenmeyer and Ambrozaitis went upstairs and knocked on the door of defendant's apartment. Defendant's wife answered the door, and told them that defendant was at work and not expected home for several hours. The detectives, fearing that defendant might flee if he should learn that police were looking for him, admittedly employed a ruse and

told defendant's wife that they were parole officers and Lachenmeyer left a card bearing the name of Supervisory Parole Officer Alan Epstein. Ambrozaitis returned to the precinct, Lachenmeyer went to get sandwiches, and Detectives Coughlin and McParland waited in the building lobby for defendant to arrive home. Shortly thereafter, defendant suddenly appeared in the lobby and approached Coughlin and McParland, asking them if they were parole officers and stating "I heard you were looking for me." They responded that they were not parole officers but detectives from the Sixth Precinct and introduced themselves by name. The detectives told him that they wished to speak with him regarding complaints of harassment made by senior citizens on his "Meals on Wheels" route and asked him to accompany them to the precinct. Defendant said "fine" but asked to go upstairs and get his coat. The detectives followed him to his apartment. There, they introduced themselves to defendant's wife as police detectives. While defendant looked for his coat, he told his wife that he was going to the precinct to discuss some complaints made about him. Defendant then put on a green army jacket. Before leaving, Detective McParland gave defendant's wife his business card identifying him as a police detective and told her she could telephone him at the precinct.

En route to the precinct defendant sat unrestrained in the back seat of the car. He and the detectives made general conversation, and when defendant asked "what it was all about", Lachenmeyer said that they would ask him some questions "on a case". Upon arriving at the precinct, defendant consented to be photographed. Then, defendant was told that the detectives were investigating the death of Florence Bour, and he was read his *Miranda* rights. Defendant indicated that he understood his rights and would have "no problem" describing his whereabouts during the past two nights. Defendant then gave a lengthy account, including stories concerning his involvement with Meals on Wheels and Mrs. Bour. As defendant spoke, Detective Ambrozaitis noticed blood splatters on his green army jacket and asked defendant if he could take the jacket to have it tested. Defendant said "take it, no problem, I have nothing to hide" and hastened to add that the blood was that of an unidentified neighbor who had recently tried to commit suicide. Defendant also freely allowed the police to take his shoes for testing.

Meanwhile, defendant's wife called the precinct, and McParland explained that defendant was still talking to other detectives. He asked if he could speak to her in person, and she

said that she would be home. McParland and Coughlin then returned to defendant's apartment and Mrs. Entzminger let them in. The detectives explained that the real reason they were speaking with defendant was because an elderly woman had been murdered on his Meals on Wheels route, and that defendant was a suspect, and they asked for her help in the investigation. Mrs. Entzminger agreed. In response to questions, she told the detectives about defendant's activities the night before, and then the detectives informed her about the blood stains found on his army jacket and shoes and asked her what he had been wearing that night. She described the jacket and shoes, and a pair of blue jeans. The detectives asked if they could take the pants for testing and she agreed. The detectives then told her about property missing from the victim's apartment and asked if they could look around. She said she did not mind and led the detectives into the bedroom and emptied several bags onto the bed. Among the items were a set of house keys. When asked to whom the keys belonged, she stated that they belonged to one of his previous customers. When McParland asked if he could take them, she handed him the keys. As they walked to the front door of the apartment, the detectives asked if they could look in the hall closet. She consented, and they looked in, but did not go through various boxes or other items on the floor. The detectives then took another jacket and pair of shoes to bring back to defendant to wear at the precinct.

The blood stains on defendant's jacket and pants matched that of the victim and the house keys belonged to the victim. Prior to trial, defendant moved to suppress this physical evidence and certain statements made at the precinct. A lengthy hearing was held at which the detectives testified, as summarized above. The defendant and his wife also testified.

The hearing court credited the detectives' testimony, found it internally consistent, and consistent with that of defendant's wife, and discredited those parts of defendant's testimony which were inconsistent. We find no reason to disturb this finding on appeal. The court denied the suppression motion, finding that defendant and his wife each voluntarily consented when surrendering the various items of physical evidence, and that defendant's statements were freely given, that he was not in custody, and that even if it were assumed that he was in custody, proper *Miranda* warnings had been given.

Defendant's major contention on this appeal concerns the ruling on the suppression motion. He claims that his consent

and that of his wife were not freely given, but were obtained through police deception beginning when they first identified themselves as parole officers.

In evaluating the voluntariness of consent, we must look to the totality of the circumstances; no one factor is dispositive. (*E.g., People v Gonzalez*, 39 NY2d 122; *Schneckloth v Bustamonte*, 412 US 218.) Among some of the factors enumerated in the *Gonzalez* case are whether there was overbearing police pressure and coercion, whether the party was under arrest, the background of the party, including prior contact with law enforcement authorities, and whether the party had been evasive or uncooperative prior to giving the consent.

Evaluating the cooperation given by defendant and his wife under these factors, their consent was properly found to be voluntary. The police never threatened the defendant or his wife, nor did they display any physical force or handcuff or restrain either of them. Furthermore, as the hearing court found, neither defendant nor his wife was "in custody" or "under arrest" when they spoke to the detectives.

Defendant's background and his prior contact with law enforcement, and his wife's background, also indicate that their consent was knowing and intelligent. Defendant had prior felony convictions, had served time in prison, and was currently under active parole supervision. Therefore, he was certainly experienced with the criminal justice system. Defendant's wife was found by the hearing court to be a "very intelligent woman". She was employed as an officer manager for a law firm. Further, she had spoken often with her husband's parole officer, and was familiar with his prior legal problems. Accordingly, his wife also had familiarity with legal procedures. Their consent cannot be said to be the product of any naiveté regarding the law enforcement process. Finally, defendant and his wife were at no time evasive or uncooperative with the police.

Defendant contends that any consent was tainted by the initial police deception when the two officers, who first spoke to his wife, employed the ruse that they were parole officers. However, the use of police strategies will not vitiate the voluntariness of the consent to a search "without some showing that the deception was so fundamentally unfair as to deny due process" (*People v Tarsia*, 50 NY2d 1, 11; *see also, People v Abrams*, 95 AD2d 155). Here, in the context of the events of the entire evening, the ruse was not "fundamentally unfair" and did not serve to coerce defendant's cooperation. Although the first two detectives misidentified themselves to defendant's

wife, at every later stage of the encounter the police correctly identified themselves. No detective identified himself to *defendant* as a parole officer. By the time defendant voluntarily accompanied the officers to the precinct, and then at the precinct when he freely surrendered his coat and shoes, he was fully apprised of the true situation, that he was being interviewed by police officers investigating a homicide. Similarly, by the time the other detectives, McParland and Coughlin, returned to defendant's apartment, his wife was apprised of all the true facts. Their cooperation was not the product of the ruse, and as the hearing court appropriately found, by the subsequent sequence of events, the ruse was attenuated and was not so unfair as to deprive defendant of due process. Concur—Kupferman, J. P., Ross, Ellerin, Wallach and Smith, JJ.