**UNITED STATES of America,**

v.

**John MONTOYA and Jose Arnulfo Calderon, Defendants.**

**No. CR 90–839.**

United States District Court, E.D. New York.

March 27, 1991.

Andrew J. Maloney, U.S. Atty., (Jeffrey Toobin, Asst. U.S. Atty., of counsel), Brooklyn, N.Y., for U.S.

Aranda & Guttlein (Jorge DeJ. Guttlein, of counsel), New York City, for defendant John Montoya.

Orden & Cohen (Joel Cohen, of counsel), New York City, for defendant Jose Arnulfo Calderon.

Christine E. Yaris, New York City (of counsel and on the memorandum).

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendants John Montoya and Jose Arnulfo Calderon move to suppress (a) statements elicited from them allegedly in violation of their rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and (b) certain physical evidence seized in Montoya's apartment allegedly in violation of the Fourth Amendment.

Count one of the indictment charges that defendants knowingly and willfully conspired to fail to file the report required by 31 U.S.C. § 5316 when knowingly transporting and being about to transport $6,400,000 from the United States to Bogota, Colombia. Count two charges them with willful failure to file such a report.

## I.

At the evidentiary hearing two witnesses testified, Edward Choo, a United States Customs Service agent, and Richard Platzer, a New York City detective. Their testimony showed the following.

On September 10, 1990, Choo heard from customs inspectors at John F. Kennedy Airport that they had seized 26 canisters purporting to contain bull semen with about $6,400,000 secreted in them. The boxes in which the canisters were packaged showed the name of the manufacturer of the canisters and on a few of them the name John Montoya and the address, 37–41 79th Street, Jackson Heights. The shipping documents named the shipper as American EXIMCO, Houston, Texas, the ultimate consignee in Bogota, Colombia, as Agrosemen, Ltd., and the forwarding agent as T.M.A. Packing of Maspeth, New York.

The agents obtained a search warrant to examine T.M.A. Packing's records. The invoice showed the shipper to be Agrosemen, Jose Calderon and John Montoya. The bill was to John Montoya, Agrosemen, Ltd., at the same Jackson Heights address.

The owner of T.M.A. Packing, Alfonso Quijano, described Montoya as a male Hispanic, approximately 5'4" with a round face and a dark complexion, and the other individual as a male Hispanic, somewhat taller, and lighter skinned.

Choo then assigned Platzer, and another detective, Thomas O'Shea, to go to the Jackson Heights address, to try to interview the men, and to see if Montoya would consent to a search of his apartment.

Platzer and O'Shea went to the address, found that Montoya lived in apartment 2–E, and received no reply after banging on the door. They waited downstairs until Montoya and Calderon, who fit the description given by Quijano, entered the front vestibule. Platzer produced his badge, identified himself, and asked Montoya his name. Montoya gave his name and, in answer to Platzer's question, stated that he lived in apartment 2–E.

Platzer then told a fictitious story that there had been accident involving a female who had a piece of paper containing Montoya's name, address, and telephone number. Platzer asked "would it be all right, I didn't have all the details, but could we go upstairs to your apartment and talk about it." Montoya agreed, and the four went up and entered the apartment.

In the apartment Platzer, saying he did not have all the facts about the accident, asked to use the telephone to call the person who had the information and would be coming. Montoya agreed. Platzer then called his office and learned that Choo was already on his way. While they awaited Choo's arrival Platzer gave Montoya evasive answers about the alleged accident.

On his arrival Choo identified himself as a Customs Service agent and told Montoya that they were investigating a shipment of goods being sent from New York to Colombia and would like to ask a few questions about it. Assuring Montoya that he was not then under arrest, Choo advised him that before asking him questions Choo would have to tell him his rights.

Choo gave Montoya his *Miranda* rights, and asked if he would consent to a search of the apartment. Montoya agreed, and Choo produced a consent to search form. Montoya read it, conferred in Spanish with Calderon, and asked Choo whether if he did not sign, the officers would not search. Choo said they would not. Montoya then said he did not wish the apartment searched but agreed to continue the conversation.

At first Montoya said that Calderon, who was present in the room, had nothing to do with the shipment. Choo asked O'Shea to take Calderon into the hallway so that they could talk with more privacy to Montoya.

At some point Platzer told Montoya that it would be in his interests to cooperate and

that if convicted he would face considerable time in jail.

While Calderon was not in the room, Montoya stated that he was shipping the goods to Colombia, knew the canisters contained money, had helped pack the money in them, knew of the requirements to notify the government before sending more than $10,000 out of the United States, and had previously done the same thing in order to avoid telling the authorities.

Asked for identification, Montoya produced a driver's license. With Montoya translating, Choo asked Calderon if he had identification. Calderon then went to a closet, opened the door, reached in, and pulled out a passport and an airline ticket. Choo saw in the closet a box of the same type as those seized at the airport containing the canisters. Calderon crossed the room, handed Choo the passport, looked back to the closet, realized he had left the door open, and crossed back to close it.

After Montoya finished his statement Choo asked him if he was willing to come to the United States Attorney's office and answer further questions. Montoya agreed. Choo asked again if he would be willing to permit a search of the apartment. This time Montoya agreed and executed the consent to search form.

The officers then searched the apartment and took some materials, including the canister, tools, paint thinners, bands, tapes and business records. Calderon, with Montoya acting as interpreter, also agreed to go to the United States' Attorney's office. The three officials, Montoya, and Calderon then carried the items taken to the two cars that took them to Brooklyn.

At the United States Attorney's office Choo gave Calderon his *Miranda* rights through an interpreter and interviewed him. In substance he said he was employed by Agrosemen in Colombia, was in the agricultural type business, and had purchased a number of the canisters to be shipped to Colombia with other material.

Montoya was also questioned again. The Assistant United States Attorney informed him that he was under no obligation to talk and could have a lawyer present if he wished. Montoya said he would answer questions and reiterated the substance of his earlier statements. Both defendants were then placed under formal arrest.

## II.

The government argues that the written consent to search the apartment was "voluntary" because "knowingly and willingly" given, and that therefore the search was not in violation of the Fourth Amendment prohibiting "unreasonable" searches. The defendants' chief contention is that the officers' use of a ruse to get into the apartment so tainted the subsequent consent as to make the later search "unreasonable."

The opinion in *United States v. Iovine*, 444 F.Supp. 1085, 1087 (E.D.N.Y.1978), explains why it seems unfruitful to frame the issue in terms of whether the consent was "voluntary." As Mr. Justice Stewart recognized in *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973), where the defendant has his wits about him a consent is almost always "voluntary" in the sense that it represents an exercise of the will to make a deliberate choice among alternatives.

But that does not mean the consent is valid. It may have been obtained by methods and under circumstances making the later search unreasonable. A consent obtained by coercive, overbearing, harassing, or humiliating tactics is invalid. *See United States v. Moreno*, 897 F.2d 26, 33 (2d Cir.1990); *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir.1988); *United States v. Forero–Rincon*, 626 F.2d 218, 224 (2d Cir.1980); *cf. United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623; *Terry v. State of Ohio*, 392 U.S. 1, 10, 14, 15, 88 S.Ct. 1868, 1874, 1876, 1876–77, 20 L.Ed.2d 889 (1968). That officers obtain entry by ruse to the place where the consent is given is one but not the only factor which bears on whether the search is proper.

It seems clear that when the officers do not have at least reasonable suspicion that the occupants are engaged in crime, there can be no justification for resorting to false statements to get into a dwelling. "[O]fficers cannot use a ruse to

gain access unless they have more than mere conjecture that criminal activity is underway. To hold otherwise would be to give police a blanket license to enter homes randomly in the hope of uncovering incriminating evidence and information." *United States v. Maldonado Garcia*, 655 F.Supp. 1363, 1367 (D.P.R.1987).

On the other hand, where the officer has reasonable suspicion and the occupant invites him in in response to an expressed desire to buy drugs, the use of such a ruse is hardly unreasonable. *Lewis v. United States*, 385 U.S. 206, 208–10, 87 S.Ct. 424, 425–57, 17 L.Ed.2d 312 (1966); *see also United States v. Glassel*, 488 F.2d 143, 145 (9th Cir.1973).

In other situations where reasonable suspicion exists the reported cases have reached a variety of results, not all of them reconcilable. Some have found nothing wrong with ruses. *See, e.g., United States v. Scherer*, 673 F.2d 176, 181–82 (7th Cir.) (agent posing as a cousin of an informant invited on property to build duck blinds), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982); *United States v. Wright*, 641 F.2d 602 (8th Cir.) (officers pretending to have car trouble and asking for tools and a flashlight see drugs inside when door opened), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *United States v. Raines*, 536 F.2d 796, 799–800 (8th Cir.) (agent falsely represented himself as a mutual friend of occupant's drug associate and stated truthfully that the associate had been arrested), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

Others have condemned them. *See, e.g., United States v. Bosse*, 898 F.2d 113, 115 (9th Cir.1990) (federal agent posed as assisting a state licensing inspector); *United States v. Giraldo*, 743 F.Supp. 152, 154 (E.D.N.Y.1990) (officers gained entry by falsely stating that a possible gas leak was a threat to the safety of the occupants).

█ This court need not determine the validity of the initial entry into Montoya's apartment. Even assuming Platzer and O'Shea acted improperly to get in, the court finds that this did not so taint Montoya's written consent as to make the consent illegal.

Choo, whose testimony (in contrast to much of Platzer's) the court finds credible as to the critical facts, was scrupulous at the moment he came into the apartment to tell Montoya the nature of the investigation and advise him of his *Miranda* rights. After receiving Montoya's initial oral consent and presenting him with a written consent to search form, Choo assured him that the officers would not search if Montoya did not sign. Only after further discussion of the shipment of the canisters to Colombia and after Montoya's admissions did Choo ask for and receive the written consent. Only after that consent was given did the officers search.

The court finds that the consent was not the result of coercive, threatening, or harassing tactics, even though Montoya, while not under formal arrest, was not free to leave. The consent certainly was not the product of any lingering annoyance or humiliation that Montoya may have felt stemming from the manner in which Platzer and O'Shea had obtained entry. Whether or not the ruse was valid, its effect on the thinking of Montoya had dissipated by the time the written consent was given. In *United States v. Oguns*, 921 F.2d 442, 447–48 (2d Cir.1990), the court held in comparable circumstances that any taint to a consent to search had been dissipated.

The court finds the search reasonable.

The court also finds that both defendants were fully advised of and understood their *Miranda* rights before making any statements.

The motion to suppress is denied. So ordered.