OPINION OF THE COURT
James A. Yates, J.
Ruben Fernandez is charged with one count of robbery in *166 the first degree, and one count of robbery in the second degree, arising from the gunpoint robbery and "carjacking” of Ibrahima Diop, a taxicab driver. Mr. Fernandez was arrested several days after the robbery as a result of a photo identification. Subsequently, he was identified by Mr. Diop in a lineup. He has moved to suppress Mr. Diop’s identification testimony on the grounds that his arrest was illegal and the identification procedures were unduly suggestive. The following is an edited version of the court’s opinion regarding the legality of Mr. Fernandez’ arrest.
In Payton v New York (445 US 573 [1980]), the Supreme Court condemned warrantless arrests in a person’s home absent carefully circumscribed exigent circumstances. This case presents a not unusual situation where the police, armed with probable cause and lacking exigent circumstances, nonetheless, attempt to avoid the warrant requirements of Payton by causing a suspect to come to the "threshold” of his home where a warrantless arrest may occur. Here, posing as parole officers, the police directed the defendant to open his door, and thereby obtained his presence at the threshold. They did so knowing that the defendant had a legal obligation to comply with a "residence check” conducted by parole officials, and that his failure to do so would constitute grounds for reincarceration. As such, the defendant did not come to the threshold and open the door voluntarily. Further, once the police succeeded in compelling the defendant’s presence at the doorway by means of this false claim of lawful authority, they reached into the apartment and pulled him out. This conduct violates both the letter and spirit of Payton.
FINDINGS OF FACT
At the hearing on the motion to suppress, the People called Police Officer Edward Myles and Detective James Maher, both of the 32nd Precinct, and the complainant, Mr. Ibrahima Diop. The defendant took the stand for the limited purpose of describing the time and place and manner of his arrest. All were credible witnesses to the extent indicated by the following findings.
THE INVESTIGATION
On March 31, 1992, Officer Edward Myles of the 32nd Precinct was assigned to investigate the robbery of a cab driven by Mr. Ibrahima Diop on March 30, 1992 at 155th *167 Street and Eighth Avenue in New York County. Officer Myles drove the complainant, Mr. Diop, from the 32nd to the 25th Precinct, in order for him to look at a number of police "mugbooks” in an attempt to ascertain the identity of the two perpetrators.
After Mr. Diop examined two mugbooks,[1] and a portion of a third, he pointed to a photograph of the defendant and identified him as one of the men who had robbed him on March 30, 1992. Subsequent to his selection of the defendant’s photo, Mr. Diop continued to look at several more mugbooks, in an unsuccessful attempt to identify the second individual involved in the crime.
When Mr. Diop had completed his examination of the mugbooks, Officer Myles referred to an index book and obtained the defendant’s name and other identifying information, which corresponded to the photo Mr. Diop had selected from the mugbook. Myles then drove Mr. Diop back to the 32nd Precinct and told him that the police would contact him at some time in the future in order for him to view a lineup.
Detective James Maher of the 32nd Precinct was also assigned to investigate this case on March 31,1992. On April 1st he spoke by telephone with Mr. Diop, who advised him that he had "seen a photo of the person who robbed him” at the 25th Precinct. At the conclusion of the conversation, Maher told Mr. Diop that "when we make an apprehension, I’m going to contact [you] to view a lineup”.
Later that day Detective Maher spoke with Officer Myles, who gave him the police report relating to Mr. Diop’s identification of the defendant. Myles also informed Maher that the defendant was on parole and gave him his parole officer’s name. Maher then contacted the defendant’s parole officer, who advised him that the defendant’s current address was 1954 First Avenue, and that he lived with his sister.
THE ARREST
The defendant, Ruben Fernandez, and Detective Maher both testified as to the circumstances surrounding the defendant’s arrest on April 5. Detective Maher testified that since he was aware of the fact that an arrest warrant is required in order to arrest an individual in their home, he had "devised a scheme” whereby he was "confident” that he could "lure” the *168 defendant out of his home in order to effectuate a warrantless arrest. This "scheme” involved calling the defendant’s home and falsely identifying himself to the defendant as "Investigator James Maher of New York State Parole”, who wanted to conduct a "residency survey” at the defendant’s home on the evening of April 5th.
The defendant testified that at some point on April 5th, his nephew answered the phone at his home at 1954 First Avenue and "was told by some officers that they were from parole and they would like to speak to” the defendant. Fernandez’ nephew then beeped him, and his sister called the "parole” officers who told her to advise the defendant to be at home at 9:00 p.m., at which time "they were going to come to talk to [him] * * * [to conduct] a residence] check”. The defendant immediately returned home and received a phone call at approximately 8:45 p.m. The caller informed him that "they were from parole and they wanted to come [and] make a residence] check [and] would I be home[?] * * * I said yeah I will be here and they said well we’ll be [t]here in about fifteen minutes”.
Approximately 15 minutes later Maher proceeded to the defendant’s home with Detective Clark in order to effectuate his arrest. After he arrived, he knocked on the defendant’s door and displayed his badge. The defendant’s door opened immediately thereafter, but Maher could not recall if he engaged in any verbal communication with the occupants of the apartment prior to its being opened.[2] He was, however, "sure that they looked through the [peep]hole” prior to opening the door. The defendant testified that after looking through the peephole he told his sister, " '[T]hat’s them’ * * * I am thinking they are from parole”. The defendant then "let [his] sister”, who was "standing beside” him, "open the door”.
While the defendant was standing in the open doorway Maher identified himself as a detective,[3] extended his hand as if to engage in a handshake, and then pulled the defendant into the hallway while simultaneously "asking” him "would you step into the hallway[?]” Maher then placed the defendant under arrest.
*169 Within several hours after defendant’s arrest he was placed in a lineup and identified by Mr. Diop.
CONCLUSIONS OF LAW
The ruse used by the police violated the defendant’s Payton rights, since he did not voluntarily open his door and thereby expose himself to warrantless arrest, but rather was coerced into doing so by Detective Maher’s false claim of authority. (See, e.g., People v Roe, 136 AD2d 140 [3d Dept 1988], affd 73 NY2d 1004 [1989]; People v Chin, NYLJ, Dec. 28, 1987, at 14, col 1 [Sup Ct, Queens County], affd 154 AD2d 960 [2d Dept 1989]; see also, United States v Al-Azzawy, 784 F2d 890 [9th Cir 1986], cert denied 476 US 1144 [1986]; People v Entzminger, 163 AD2d 138 [1st Dept 1990], lv denied 76 NY2d 939 [1990] .)
Clearly, Detective Maher had probable cause to arrest the defendant, since he had been identified by Mr. Diop as the man who had robbed his cab. (See, e.g., People v Gonzalez, 138 AD2d 622 [2d Dept 1988], lv denied 71 NY2d 1027 [1988]; People v Coleman, 114 AD2d 906 [2d Dept 1985].) However, while a warrantless arrest is permissible, if it is made in public, the police are required, absent cpnsent or exigent circumstances, to obtain a warrant before they may lawfully arrest an individual in his or her home. (Payton v New York, 445 US 573 [1980], supra; People v Harris, 77 NY2d 434 [1991] .)[4]
It must be determined whether Detective Maher’s tricking the defendant into opening his door and pulling him from his doorway constituted a violation of Payton. In interpreting our State Constitution, the New York Court of Appeals has not squarely confronted the issue of whether Payton prohibits threshold arrests. (Compare, People v Kozlowski, 69 NY2d 761 [1987], with People v Levan, 62 NY2d 139, 145 [1984].) However, there is appellate authority for the proposition that Payton is not implicated when an individual is arrested while voluntarily standing at the threshold of his residence. (See, *170 e.g., People v Rosario, 179 AD2d 442 [1st Dept 1992], lv denied 79 NY2d 1053 [1992] [defendant’s Payton rights not implicated where he voluntarily opened door in response to knock by sexual abuse victim and was immediately placed under arrest at doorway of his apartment by police who had hidden themselves while victim knocked]; People v Anderson, 146 AD2d 638 [2d Dept 1989], lv denied 74 NY2d 660 [1989] [no Payton violation where defendant arrested as he voluntarily stood in front doorway after police requested that he come outside]; People v Nonni, 141 AD2d 862, 863 [2d Dept 1988], lv denied 72 NY2d 960 [1988], reconsideration denied 73 NY2d 788 [1988] ["defendant was arrested in a public place — at the threshold of his residence — and thus, was not in an area in which he had any expectation of privacy”]; but see, People v Levan, 62 NY2d, at 145, supra [emphasizing that United States v Santana, 427 US 38 (1976) involved "hot pursuit” of a defendant initially seen by the police outside her home who attempted to escape arrest by retreating "into the vestibule of her home” and was believed to be holding destructible evidence]; People v Robert, 156 AD2d 730 [2d Dept 1989], lv denied 76 NY2d 741 [1990] [Payton violation found since defendant, who only opened his door a "crack” in order to see who was there, "was not standing on the threshold of the door holding himself out to the public”, as was the defendant in United States v Santana].)
Even assuming that Payton is not violated by a warrantless threshold arrest, it is nevertheless clear that an individual arrested under such circumstances must have voluntarily abandoned the confines of his home and thereby exposed himself to a warrantless arrest. (See, People v Minley, 68 NY2d 952, 953-954 [1986] [Payton not violated where the police approached defendant’s home, saw him peeking through a window and directed him to come out, since there was "no indication that defendant was in any way threatened or that he had even seen the officer's gun before he exited his home and was placed under arrest”] [emphasis added].) Thus, Ruben Fernandez’ arrest was legal only if the ruse used by Detective Maher did not render his opening the door and standing in the threshold involuntary.[5]
*171 Several New York courts have held that the police may circumvent the dictates of Payton by using "noncoercive subterfuge” to trick an individual into exiting his home in order to effectuate his warrantless arrest. (People v Roe, 136 AD2d, supra, at 143, quoting 1 LaFave and Israel, Criminal Procedure § 3.6, at 22 [emphasis added] [no Payton violation where undercover officer lured defendant from his home on pretext that undercover and defendant’s acquaintance "had encountered car trouble a short distance from defendant’s residence” (at 141)]; see also, People v Richardson, 137 AD2d 105 [3d Dept 1988].) However, as the People correctly note, "not every kind of deceit is unobjectionable”.
In Roe (supra), the Appellate Division, Third Department, emphasized that, "[t]he primary consideration is whether [the] defendant left his home voluntarily * * * [and] was in no way compelled or coerced by police authority to forego the inviolability of his home [citations omitted]”. (People v Roe, supra, at 143 [emphasis added]; see also, People v Chin, supra, at 14, col 3 [violation found where officer "deliberately tricked” defendant into exiting home by asking him to accompany him to the precinct to investigate a complaint he had made, since ruse "falsely instill(ed) in the defendant the feeling that the police were there to help him as public servants in investigating his complaint to the police”]; 1 LaFave and Israel, Criminal Procedure § 3.6, at 43 [warrantless arrest rendered illegal "when the police utilize coercion or a false claim of authority to gain the defendant’s presence at (or even outside) the door”] [emphasis added]; cf., People v Howard, 90 Misc 2d 662 [Sup Ct, NY County 1977].)
Since Ruben Fernandez was a parolee, a failure on his part to comply with the terms and conditions of his parole would constitute grounds for the revocation of his parole and return to a correctional facility. (9 NYCRR 8003.1, 8004.1.) As with all parolees, he was required, prior to being released, to state "in writing, in the presence of a witness, that he ha[d] read and understood the conditions of release”. (9 NYCRR 8003.1 [c].) Moreover, he was given a copy of these terms and condi *172 tians upon his release to supervision. (9 NYCRR 8003.2; see also, People ex rel. Henderson v Meloni, 162 AD2d 999 [4th Dept 1990], lv denied 76 NY2d 708 [1990].) One of these conditions involved submitting to "residence checks”, which obligated him to "permit his parole officer to visit him at his residence and/or place of employment and * * * [to] permit the search and inspection of his person, residence and property”. (9 NYCRR 8003.2 [d].)
Despite the fact that the police had probable cause to arrest the defendant some five days before he was taken into custody, at no time during that period was any attempt made to secure either an arrest warrant or a search warrant. (See, People v Levan, supra, at 143.) Knowing that the defendant was on parole, they impersonated parole officers seeking to perform a "residence check” both to guarantee that the defendant would be home when they arrived to make the arrest as well as to compel him to open the door of his apartment. It is telling that Detective Maher did not reveal his true identity to the defendant until after he had exposed himself to warrant-less arrest by opening the apartment door. Hence his "confidence” that an arrest warrant was unnecessary.
It cannot be said that the defendant voluntarily opened his door when he complied with the "request” of "Investigator James Maher of New York State Parole” that he submit to a "residence check.” Rather, it is clear that he was coerced into doing so by the detective’s false claim of authority. (See, People v Entzminger, supra, at 141-142 [recognizing coercive effect on consent when police falsely identify themselves to defendant as parole officers]; People v Roe, supra; People v Chin, supra; 1 LaFave and Israel, op. cit.; cf., People v Gonzalez, 39 NY2d 122, 124 [1976]; Bumper v North Carolina, 391 US 543 [1968]; People v Whitehurst, 25 NY2d 389 [1969].) For that reason, I find that defendant’s threshold arrest violated Payton and was therefore illegal. This decision is grounded upon both Federal (US Const 4th Amend) and New York State (NY Const, art I, § 12) law with reliance upon each constitutional provision as a separate, adequate and independent basis for the decision. (Michigan v Long, 463 US 1032 [1983].)
*173 Defendant’s motion to suppress testimony concerning the lineup as a product of his unlawful arrest is therefore granted.[6] *8

. Each mugbook contained approximately 75-100 photos.

. Maher testified that two women and possibly a child were present in the apartment at the time of defendant’s arrest.

. This court accepts the People’s assertion that Detective Maher "dropped all pretensions of being a probation [sic] representative [and] introduced himself as a detective”, but did so after the door to the apartment was opened.

. This court rejects the People’s argument, first advanced in papers after the hearing, but wholly unsupported by the record, that defendant’s arrest was justified by exigent circumstances. (See, e.g., People v Levan, 62 NY2d 139, 146 ["the police themselves cannot by their own conduct create an appearance of exigency”]; People v Dubois, 140 AD2d 619 [2d Dept 1988], appeal denied 72 NY2d 911 [1988]; People v Bero, 139 AD2d 581 [2d Dept 1988].) The police had more than enough time to apply for a warrant.

. It is possible that a finding that this ruse was illegal would not automatically require a finding that Payton was violated if the defendant, aware of the fact that the officers were not from the Division of Parole after he opened the door, nevertheless voluntarily chose to step into the hallway. *171 However, as noted above, the defendant was forcibly pulled from the threshold of his apartment by Detective Maher as he reached into the apartment. (Compare, People v Minley, supra.)

. At the hearing, the People called Mr. Diop. By his testimony, they established that he had an ample opportunity to observe the perpetrators during the robbery. As such, an independent basis for the admission of an in-court identification exists and will be permitted. (See, e.g., People v Brnja, 50 NY2d 366 [1980].)