*182 OPINION OF THE COURT
Herbert I. Altman, J.
Defendants move to suppress physical evidence and statements.
On May 22, 2002 and several days following I presided over a combined Mapp, Huntley and Dunaway hearing ordered by Judge Wittner, who limited the hearing to the events following the arrival of the police at the hotel room in which narcotics were found. When defendants moved to reargue her decision, she indicated that I was free to hear defendant’s arguments and to depart from her ruling if I chose. It was the position of the People that the scope of the hearing should not be expanded. Upon reargument, I adhered to Judge Wittner’s decision. Special Agent James Lasota of the Drug Enforcement Agency (DEA), and New York City Police Detective Felix Cuebas testified on behalf of the People. Each of the defendants testified. In addition, the defense called DEA Agent Lisa Leonardo.
According to the People’s witnesses, at 1:40 p.m. on August 15, 2001 seven or eight members of the New York Drug Enforcement Task Force positioned themselves outside of room 512 at the Best Western Eden Rock Hotel in Queens County. They were in civilian clothes and wore bullet-proof vests and other protective gear. They did not know if anyone inside the room was armed. None of the members of the task force had a weapon drawn. Detective John Loney announced that he smelled drugs. Special Agent Lisa Leonardo knocked on the outer door of the room and announced “housekeeping.” Defendant Jimenez opened the door approximately half way. Agent Lasota saw a full view of Jimenez, who was wearing shorts but no shirt. He had white powder on his forearm and the bridge of his nose. Lasota detected a pungent odor reminiscent of vinegar, which, his experience told him, was associated with heroin. Defendant Ramirez, also dressed only in shorts, then came up behind Jimenez and opened the door further. When he did so, Lasota was able to see a table and other furniture in the room behind the defendants. There was a towel on the table. Fiber threads were strewn on the floor. Agent Lasota saw motes of powder in the air, made visible by the light streaming through the window. He could see more powder settling on the table, the television and the other glossy furniture in the room.
Lasota, speaking English, identified himself as police and asked the defendants to step out into the hallway. His request *183 was translated into Spanish by Detective Cuebas. After they complied, Lasota and other members of the task force entered the room to perform a protective sweep to see if anyone was hiding in the room. They performed the sweep “for safety reasons.” While he was in the room, Lasota noticed a plastic ziplock bag containing powder on the nightstand between the two beds. The defendants, who were being detained in the hallway, facing away from the door but not in handcuffs, were then read their Miranda rights from a card, in Spanish, by Detective Cuebas. They both indicated that they understood their rights. After 10 or 15 minutes they were taken into an adjacent room, where they were given the opportunity to use the bathroom and wash. They were also given water.
The defendants were seated on one of the beds in the room, at the foot of which sat New York City Police Lieutenant Jackson. Loney and Lasota sat on the bed opposite them. Cuebas, interpreting on behalf of Lasota, inquired where they were from and what they were doing and asked them if they would give their consent to a search of the room. Each orally gave his consent. They also stated that there were drugs in the room. Cuebas asked to whom the room was registered and defendant Ramirez stated that it was registered to him. He was then handed a blank preprinted consent form for the search of room 512. Ramirez took the form, which was in Spanish, and read it aloud. He stated that he understood it and signed it. Lasota and Jackson went back to room 512 and searched it, finding, in addition to the powder in the ziplock bags, additional drugs sewn into the lining of clothing found in the room, drug paraphernalia and documents. When Lasota returned 45 minutes later the two were advised that they were under arrest and handcuffed.
The defendants described events differently. According to Jimenez, who is 28 years old and finished two years of high school, upon opening the door a few inches to answer the knock announcing “housekeeping,” he was thrust back as the members of the task force, guns drawn, pushed their way into the room. There were no drugs in open view because the two had not yet begun to unpack the powder from the cloth bags in which it had been packaged. Additionally, there was no coating of powder on the furniture, in the air or on the body of Jimenez. There was no ziplock bag of powder on the nightstand. Rather, a cloth bag containing powder was on a table that defendants had pushed against the nightstand between the two beds. The bag was covered by a cloth. The remainder of the drugs were *184 secreted elsewhere in the room. As soon as Lasota and the other law enforcement personnel entered the room, they placed both defendants in handcuffs. Jimenez was told that it would be to his benefit to cooperate. He was not told that he had a right to an attorney. The defendants were taken to a nearby room where they were seated on the bed, in handcuffs. Ramirez, who completed one year of high school, was never asked to give his consent to search room 512. He did not read the written consent form that he signed. He was told that nothing would happen to him and that the form only signified that the police had been there. No one explained to him that by signing the form, he was giving the police his permission to search the room.
I credit the testimony of the People’s witnesses and accept their version of the events, with one notable exception. It is not credible that Detective Loney smelled drugs in the hallway. There was no testimony that heroin has a distinctive odor or that described the nature of that odor. As Detective Loney did not testify, there was no inquiry into any natural ability or training which would enable him to recognize such an odor through a closed door. No one else testified that there was a distinctive odor in the hallway prior to the door being opened and I discount the possibility that there was such a pervasive odor, as the drugs that were seized in this case were packaged. I also note that Lasota testified that only after the door was opened did he detect a pungent vinegar-like odor which he associated with heroin.
In this case the defendants were precluded from inquiring into events which transpired prior to the arrival of the task force at the hotel. Judge Wittner and I limited the hearing to this time frame at the People’s insistence and despite repeated attempts by the defense to open the hearing to events leading up to the arrival of the task force and to an exploration of the knowledge of the police prior to that time. The People, who apparently took their stance in a desire to shield the source or sources of their information from the defendants, elected to defend the seizure purely on the basis of the plain view and consent doctrines. They took the position that what the police discovered after arriving at the hotel completely justified their actions without reference to any prior knowledge or information. I find to the contrary.
The defendants had an expectation of privacy in the hotel room in which they were staying (see People v Ali, 131 AD2d 857). The People must therefore establish that their entry into *185 the room and the subsequent seizure of physical evidence did not violate Fourth Amendment strictures. They seek to do so on the theory that the defendants voluntarily consented to the search. As I find that there was no basis for the police to induce Jimenez to open the door of his hotel room under a false representation, and that the taint flowing from this action was not attenuated by subsequent events, I conclude that suppression of both the physical evidence discovered in the room and defendant’s statements is warranted.
There were two distinct attempts to gain consent during this incident. The first was obtaining the consent of defendant Jimenez to open the door of his hotel room and the second was obtaining defendants’ consent to search the room after they had been taken to an adjoining room. The People, who bear the burden of establishing that consent was voluntary under the totality of the circumstances (see People v Gonzalez, 39 NY2d 122; Schneckloth v Bustamonte, 412 US 218), contend that in each case, consent was voluntarily given. As to the second attempt, they focus on the fact that the task force did not have weapons drawn, did not handcuff or formally arrest the defendants until after the search and did not threaten them. These factors, they argue, rendered the atmosphere noncoercive. They contend that the noncoercive atmosphere, combined with such factors as defendants’ cooperativeness and lack of resistance, relatively high educational level, and the fact that they were advised that they did not have to give their consent to the search, lead ineluctably to the conclusion that their consent was truly voluntary (see People v Entzminger, 163 AD2d 138, 141). As to the initial entry into the room, the People simply contend that the deception employed by the police was not fundamentally unfair.
As to the initial entry, the People argue that the police may simply employ a trick or ruse to obtain a defendant’s consent to enter his home as long as the deception is not “so fundamentally unfair as to deny due process” (People v Entzminger, supra at 141). The police may not gain entry to a person’s home simply by accompanying someone known to him into his home and failing to identify themselves, for example (People v Matta, 76 AD2d 844). Additionally, they may not falsely represent facts such that a person would feel compelled to yield to their apparent right to enter. Falsely informing a person that they have a search warrant (Bumper v North Carolina, 391 US 543) or misrepresenting that they had been sent to check for a suspected gas leak (People v Jefferson, 43 AD2d 112) are ruses *186 of the type that are deemed coercive and which are consequently disallowed. The People conclude that because the police did not resort to such tactics in this case, their conduct was appropriate. That the ruse they employed was not coercive, however, does not end the inquiry. At issue is another question entirely — whether the police are justified in employing any ruse, regardless of its lack of coerciveness, to induce a person to give up his privacy, when they have no cause to believe that he is engaged in criminality.
Although there is no authority in this jurisdiction speaking directly to this question, in every reported case in which the use of a ruse to gain entry to a person’s home was upheld, the police had some knowledge that a person sought by them in connection with criminality or evidence of crime or contraband could be found within (see, e.g., People v Entzminger, supra; People v Esposito, 191 AD2d 746; People v Gilbert, 122 AD2d 454). Several courts in other jurisdictions have expressly adopted the requirement that a ruse may be used to gain entry to private premises only when there is either an articulable basis or reasonable suspicion to believe that criminal activity may be found within (see State v Ahart, 324 NW2d 317 [Iowa 1982]; State v Johnson, 253 Kan 356, 856 P2d 134 [1993]; United States v Montoya, 760 F Supp 37 [ED NY 1991]; United States v Garcia, 655 F Supp 1363; see also Guidry v State, 671 P2d 1277 [Alaska 1983]).[1] In United States v Garcia (supra), the police and postal inspectors visited the defendant’s home after receiving an anonymous tip that stolen mail could be found there. The police announced that they were there to serve a summons, were permitted to enter and observed stolen mail that was subsequently the subject of defendant’s suppression motion. In granting the motion, the court expressed the rationale for the rule:
“It is true that consent is not necessarily vitiated by deception and subterfuge on the part of the police. But officers cannot use a ruse to gain access unless they have more than mere conjecture that criminal activity is underway. To hold otherwise would be to give police a blanket license to enter homes randomly in the hope of uncovering incriminating evidence and information” (United States v Garcia, supra at 1367 [citations omitted]).
*187 A contrary rule would not be consonant with existing law in this jurisdiction. In every aspect of Fourth Amendment law the police require some predicate before they can intrude upon a person’s privacy. Unless they witness a traffic infraction or the like, they may not stop a moving vehicle unless, at a minimum, they have reasonable suspicion that criminality is afoot (see People v May, 81 NY2d 725). They may not ask for consent to search one that they have lawfully stopped absent the same level of suspicion (see People v Turriago, 219 AD2d 383, affd as mod 90 NY2d 77). They may not even approach a vehicle that is parked without an objective, credible reason (see People v Harrison, 57 NY2d 470). In the area of street encounters, the same type of scheme applies. The police may exercise their common-law right of inquiry only when they have a founded suspicion that criminality is afoot (see People v De Bour, 40 NY2d 210). Even the most limited intrusion by the police of a person walking on the street “must be predicated on more than a hunch, whim, caprice or idle curiosity” (People v Ocasio, 85 NY2d 982, 985).
It cannot be doubted that the police may not arbitrarily ask a person to open the door of his residence any more than they could ask someone chosen randomly to open up the sealed packages he is carrying on the street in the hope of finding stolen goods. That they could lawfully use a subterfuge to trick him into opening the door of his residence when they did not have an articulable reason to intrude upon his privacy is an even more startling proposition. Even had the hallway smelled of vinegar before Jimenez opened the door, there still would have been no predicate for the use of the trick. A vinegar smell alone would have proved nothing and could not have provided a reason to take any further action, let alone trick the defendants into opening the door of their hotel room.[2]
As they had no right to trick the defendants into opening the door, the task force had no lawful view of the inside of the room. The plain view doctrine, which requires that the police lawfully be in a position to make their observation (see People *188 v Brown, 96 NY2d 80) is, thus, inapplicable (see People v Allende, 39 NY2d 474; People v Lott, 102 AD2d 506).[3] That being the case, I do not have to reach the issue whether their entry into the room subsequent to the removal of Jimenez and Ramirez was also improper.[4]
Although I find that the acts of the task force prior to their asking defendants’ consent to search tainted everything that followed, it is álso far from clear that, the initial ruse aside, consent was voluntarily given to the search of the room. Although the task force did not have weapons drawn and did not handcuff or threaten the defendants, the atmosphere was nonetheless replete with coercive elements. Defendants were asked to vacate their room by seven or eight armed law enforcement agents wearing protective gear, kept standing in the hallway in nothing but their undershorts for 10 minutes and then taken to an adjoining room. There they were seated on the bed while an agent sat at its foot and two others, seated on the bed across from them, faced them. Surrounded by these agents, they were asked for consent to search their room. Their educational level was not so high and their familiarity with the laws of the United States so great that they would be familiar with the niceties of the Fourth Amendment. The People stress that the defendants were always docile and cooperative, but that is not surprising given the apparent power of the state that was so manifestly arrayed against them. What is more, when the defendants gave their consent they knew that law enforcement agents had already been in their room. They had seen them enter and make a cursory search during the protective sweep and knew that the agents had already seen the drugs in open view. Under these circumstances, it would have seemed pointless for them to deny the police entry in form when they already had entry in fact. I find, therefore, that they did not voluntarily give them consent.
I also find that the taint stemming from the use of the ruse was not dissipated by subsequent events. The attenuation doc *189 trine permits evidence to be admitted at trial despite preceding police misconduct if the causal connection between the evidence and the misconduct is sufficiently attenuated (Wong Sun v United States, 371 US 471). Three criteria must be examined to determine whether taint has sufficiently dissipated: the time period between the illegality (which is almost invariably an illegal arrest) and ensuing admission, the presence of intervening factors, and the purpose and flagrancy of the misconduct (see People v Martinez, 37 NY2d 662; Brown v Illinois, 422 US 590). In this case the initial police impropriety was not an illegal arrest, but the use of the ruse.
The passage of time did nothing to cure the taint, as defendants gave their consent and admitted that there were drugs in the room within a half hour of the knock on the door. The People argue that the administration of Miranda warnings to defendants while they stood in the hall was a factor which dissipated the taint. Although the administration of Miranda warnings is an important attenuating factor, it is not a conclusive one (see People v Conyers, 68 NY2d 982). Alone, it is never sufficient (Dunaway v New York, 442 US 200; People v Byas, 172 AD2d 242). The sight of drugs in the room following use of the ruse was not an attenuating factor because it was the direct product of the original illegality (cf. People v Johnson, 102 AD2d 616; People v Brown, 215 AD2d 333).
The most important factor to be considered is the flagrancy of police misconduct. Again, because defendants were precluded from inquiring into the knowledge of the task force prior to its arrival, the testimony establishes only that seven or eight law enforcement agents in protective gear arbitrarily descended upon a hotel room and, without any lawful predicate, used trickery to invade the privacy of its occupants. These unexplained actions give the appearance of an intentional misuse of police power. As much as I suspect that it was nothing of the kind, I can only find otherwise without speculating as to matters intentionally kept out of the record at the insistence of the People.
Accordingly, defendants’ motions to suppress statements and physical evidence are granted in their entirety.

. Two other jurisdictions have rejected this position (see State v Hastings, 119 Wash 2d 229, 830 P2d 658 [1992]; People v Catania, 427 Mich 447, 398 NW2d 343 [1986]).

. To hold to the contrary would be to sanction the use of similar police deception any time there was a verified report of vinegar in the air. I note there was no evidence that there was an odor in the hallway before the door was opened, with the exception of Lasota’s testimony that Loney announced that he smelled drugs, which I discount. There was also no proof that the scent was so distinctive that the officers knew with certainty that it indicated the presence of heroin (cf. People v Turchio, 244 AD2d 366 [smell of marijuana alone is sufficient to provide a trained police officer with probable cause to search]).

. If the People’s position were followed and there were no requirement that the police possess a predicate before employing stratagems to trick people into opening the doors of private premises, the Fourth Amendment would soon be eviscerated. They could arbitrarily knock on anyone’s door, employ a ruse to have those inside open the door to them, use the plain view doctrine to peer inside, and perform protective sweeps to get views of anything that was not in their direct line of their sight.

. Given the equivocal significance of what they claimed they were able to see, and the limitations of the protective sweep doctrine, it is doubtful that the sweep was legal (Maryland v Buie, 494 US 325; People v Fields, 45 NY2d 986).