John LAURO, Jr., Plaintiff,

v.

THE CITY OF NEW YORK, the Police Department of the City of New York, and Michael Charles, Defendants.

No. 95 Civ. 8908(AGS).

United States District Court, S.D. New York.

Feb. 25, 1999.

---

Philip J. Dinhofer, New York City, for Plaintiff.

Orrit Hershkovitz, Assistant Corporation Counsel, City of New York, Law Department, New York City, for Defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiff John Lauro, Jr. ("Plaintiff") claims that, on September 18, 1995, defendants deprived him of rights guaranteed by the United States Constitution and New York state law when he was allegedly arrested unlawfully by defendant Detective Michael Charles ("Det.Charles") and subjected to a "perp walk" in view of television cameras of *Fox 5 News*. Defendant moves for summary judgment, and plaintiff cross-moves for partial summary judgment on the issue of liability. For the reasons stated herein, plaintiff's motion is granted in part and denied in part, and defendants' motion is granted in part and denied in part. Although we find that plaintiff was lawfully arrested, we conclude that the "perp walk" conducted by Det. Charles violated plaintiff's rights as secured to him by the Fourth Amendment to the United States Constitution.

## FACTUAL BACKGROUND

Plaintiff at the time of his arrest was a doorman and elevator operator at Beekman Town House, located at 166 East 63rd Street in Manhattan (the "Building"). (Plaintiff's Rule 56.1 Counter–Statement of Undisputed Facts ("Pl.'s 56.1") ¶ 1.) Plaintiff commenced such employment in February, 1991, and remained employed at the Building until September, 1995. (*Id.*)

Plaintiff's responsibilities included the opening and closing of doors for tenants and guests, hailing taxis, and operating the elevator. (*Id.* at ¶ 2.) During his tenure at the Building, plaintiff developed a friendly relationship with a number of the Building's tenants, but came into disfavor with certain members of the Building's management staff and board members. (*Id.* at ¶ 3.)

Matthew Eberhart ("Eberhart") was a tenant, and plaintiff was the doorman at the Building in early September, 1995. (Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 1.) Eberhart resided with his girlfriend and their child. (Pl.'s 56.1 ¶ 60.) In September, 1995, Eberhart and plaintiff agreed that plaintiff would deliver Eberhart's family's mail and water their plants while they were away on vacation.[1] (Defs.' 56 .1 ¶¶ 4, 5.) Eberhart spoke with the superintendant of the Building, Paul Molnar ("Molnar"), and told him that plaintiff would be taking care of the apartment while Eberhart was away. (Pl.'s 56.1 ¶ 64.) Plaintiff asked Eberhart to sign a written authorization giving him permission to enter Eberhart's apartment. (Defs.' 56.1 ¶ 4.) Eberhart did so, and gave plaintiff the keys to the apartment approximately two days before he and his family left for vacation. (Defs.' 56.1 ¶ 5.) During a visit to Eberhart's apartment, plaintiff commented regarding his admiration of various aspects of Eberhart's apartment. (Pl.'s 56.1 ¶ 65.)

Molnar came to Eberhart's apartment approximately ten minutes before Eberhart was planning to leave for his vacation and cautioned Eberhart that plaintiff had been suspected of committing numerous thefts in the building. (Defs.' 56.1 ¶ 6; Pl.'s 56.1 ¶ 66.) Molnar did not volunteer to watch the Eberhart apartment, because he was too busy. (Pl.'s 56.1 ¶ 69.)

After speaking with Molnar, Eberhart decided to place a wireless baby camera on top of the entertainment unit of his bedroom. (Defs.' 56.1 ¶ 7.) The camera is white, with a lens approximately the size of a nickel, and approximately 4–5 inches wide by 7 inches high and three inches deep. (Defs.' 56.1 ¶¶ 8, 9.) The camera transmits to a television monitor with a viewing screen that can be connected to a video cassette recorder ("VCR"). (Defs.' 56.1 ¶ 10.) Eberhart and Molnar agreed that the monitor would be placed in Molnar's apartment, which is located on the same floor as Eberhart's apartment, and can be seen from Eberhart's window. (Defs.' 56.1 ¶ 11.) Molnar agreed to observe the monitor while the Eberharts were away, and Eberhart connected the camera to Molnar's VCR to enable Molnar to record the camera's images. (Defs.' 56.1 ¶¶ 12, 13.) Eberhart removed his valuables from the apartment, except for a computer. (Defs.' 56.1 ¶ 14.)

Molnar made a recording of the camera's images on his VCR (the "Videotape") on the day after the Eberharts left for vacation. (Defs.' 56.1 ¶ 17.) Eberhart and Molnar viewed the Videotape when Eberhart returned from his vacation on September 17, 1995. (Defs.' 56.1 ¶¶ 15, 16.)

The Videotape shows the bedroom, including a bed, nightstand, bassinet, chest of drawers, and two closets. (Defs.' 56.1 ¶ 18; Plaintiff's Exhibit R ("Pl.Exh. R.")) The hallway from the bedroom can be seen leading to the bathroom on the right and to the living room on the left. (Defs.' 56.1 ¶ 19; Pl. Exh. R.) Items in the bedroom that were outside the camera's view include the entertainment unit, with two cabinet doors, upon which the camera rested; a wall with a window and air conditioning unit; two bicycles that leaned against another wall; a nightstand to the left of the bed; and a plant that hung in front of the bedroom window slightly above the height

---

1. Although defendants contend that this arrangement stemmed from a proposal by plaintiff, (Defs.' 56.1 ¶ 3), plaintiff asserts that it was Eberhart who first asked him. (Pl.'s 56.1 at 61.)

of the camera. (Defs.' 56.1 ¶¶ 20—23; Pl. Exh. R.)

The Videotape runs for approximately twenty minutes. (Defs.' 56.1 ¶ 25; Pl. Exh. R.) Plaintiff is seen entering the Eberharts' bedroom five times, carrying a water pitcher the third time only. (Defs.' 56.1 ¶¶ 25, 26; Pl. Exh. R.) Plaintiff is also seen opening and closing the doors to the closet and at least two dresser drawers. (Defs.' 56.1 ¶¶ 25, 27; Pl. Exh. R.) At one point, plaintiff is seen touching a small cabinet on top of the dresser, opening a drawer, and handling the contents of that drawer. (Defs.' 56.1 ¶ 29; Pl. Exh. R.) Plaintiff is also heard opening and closing the blinds of the window, the doors of the entertainment unit, and the doors on the nightstand. (Defs.' 56.1 ¶ 31; Pl. Exh. R.) There is no evidence that anything was taken from the room, and the Videotape at no time shows plaintiff removing any object or attempting to conceal any item. (Pl.'s 56.1 ¶ 20.) Upon returning to his apartment, Eberhart did not determine that anything in particular was missing. (Defs.' 56.1 ¶ 38.) Eberhart also found that his mail had been brought in. (Pl.'s 56.1. ¶ 72.)

Eberhart contacted five television stations regarding the Videotape of plaintiff, all of which were interested in viewing the Videotape; eventually he gave *Fox 5 News* an exclusive license to broadcast the Videotape in return for two hundred dollars. (Defs.' 56.1 ¶ 35.) Shortly afterwards, Eberhart contacted the police in order to file a complaint against plaintiff. (Defs.' 56.1 ¶ 36.)

Detective Thomas Ryan ("Det.Ryan") interviewed Eberhart at approximately 5:30pm on September 18, 1995, and prepared a written report shortly thereafter. (Defs.' 56.1 ¶¶ 37, 39; Pl.'s 56.1 ¶¶ 76, 77.) Detective Ryan and his partner, Det. Charles (the "Detectives"), allegedly aware that plaintiff had permission to enter Eberhart's apartment for the purpose of watering the plants, were given a copy of the Videotape and viewed it on their own subsequent to their interview of Eberhart. (Defs.' 56.1 ¶¶ 40, 41; Pl.'s 56.1 ¶ 80.) The Detectives concluded that probable cause existed to arrest plaintiff. (Defs.' 56.1 ¶ 42; Pl.'s 56.1 ¶ 95.)

Plaintiff is and was at all relevant times a resident of New Jersey. (Defs.' 56.1 ¶ 43.) The Detectives obtained plaintiff's address from Eberhart, with Molnar's assistance. (Pl.'s 56.1 ¶ 85.) Because officers of the New York City police department do not have the authority to effect an arrest outside of New York, the Detectives drove to plaintiff's apartment in New Jersey for the purposes of bringing him back to New York where he could be arrested. (Defs.' 56.1 ¶ 44.) The Detectives arrived at plaintiff's home in New Jersey during the evening of September 18, 1995. (Defs.' 56.1 ¶ 45.)

At plaintiff's home, Det. Charles told plaintiff that Eberhart had complained to the police that plaintiff had stolen from Eberhart's apartment, and that the police wanted to question plaintiff about it. (Defs.' 56.1 ¶¶ 46—47.) The parties dispute whether Eberhart informed the police that, despite the Videotape, he had not yet identified any particular items as missing from his apartment. (Pl.'s 56.1 ¶ 78; Defendant's December 23, 1998 Statement of Disputed Facts Pursuant to Rule 56.1 ("Defs.' Opp. 56.1") ¶ 37.)

The parties dispute the circumstances under which plaintiff agreed to accompany the Detectives back to New York. Plaintiff asserts that the Detectives were deceitful in luring him into New York, lying about whether they were planning to arrest him upon his arrival in New York. (Pl.'s 56.1 ¶¶ 48, 96.) Defendants admit that Det. Charles gave a deceptive response when asked by plaintiff whether he would be arrested in New York, but deny that the Detectives specifically lied to plaintiff with regard to whether plaintiff would be arrested or driven back to New Jersey. (Pl.'s 56.1 ¶ 97; Defs.' Opp. 56.1 ¶¶ 3, 10, 48.)

After arriving at the 19th precinct in New York City, plaintiff was taken to the Detective Squad room, where he remained for several hours. (Defs.' 56.1 ¶ 49.) Det. Charles thereafter questioned plaintiff with regard to several thefts at the Building, and showed him the Videotape recorded by Molnar. (Defs.' 56.1 ¶ 50.) Defendants assert, but plaintiff disputes, that plaintiff was read his *Miranda* rights at this point. (Defs.' 56.1 ¶ 50; Plaintiff's Statement of Facts Pursuant to Rule 56.1 ("Pl.'s Opp. 56.1") ¶ 4.) Plaintiff acknowledged that he was the individual depicted in the Videotape. (Defs.' 56.1 ¶ 51.)

Plaintiff was arrested and charged with the crime of burglary in the second degree, N.Y. Penal Law § 140.25; petit larceny, N.Y. Penal Law § 155.25; and criminal possession of stolen property in the third degree, N.Y. Penal Law § 165.50. (Defs.' 56.1 ¶ 52.) In response to plaintiff's questions as to why he was being arrested, Det. Charles responded that he was being arrested because plaintiff "stole something out of that apartment . . . ." (Defs.' 56.1 ¶ 53.)

Approximately two hours after plaintiff was brought to the precinct's squad room, Det. Charles received a call from the Police Department's Office of the Deputy Commissioner of Public Information ("DCPI") informing him that the media was interested in plaintiff's case, and that plaintiff should be taken on a "perp walk." (Defs.' 56.1 ¶¶ 54, 55, 56; Pl.'s 56.1 ¶ 52.) A "perp walk." or "walk" is a Police Department term that refers to walking an arrestee outside the precinct pursuant to a request from the media. (Defs.' 56.1 ¶ 56.) The parties dispute whether Det. Charles had the discretion to refuse the "perp walk" request. (Pl.'s 56.1 ¶ 52; Defs.' Opp. 56.1 ¶ 22.) [2]

Plaintiff was handcuffed, walked by Det. Charles down the stairs, out the front door, and outside of the precinct; then placed into an unmarked car, driven around the block, and walked back into the precinct. (Pl.'s 56.1 ¶¶ 21, 53; Defs.' 56.1 ¶ 57.) [3] Plaintiff was filmed by a television crew from *Fox 5 News* outside the precinct building during this procedure. (Defs.' 56.1 ¶ 58; Pl.'s 56.1 ¶ 21.) The footage from this "perp walk," along with excerpts from the baby camera Videotape, were shown on the *Fox 5 News* at 10:00pm on September 18, 1995 and the mid-day and 10:00pm evening news the next day, September 19, 1995. [4] (Pl.'s 56.1 ¶ 21; Pl.'s Exhibit 6.)

Plaintiff thereafter commenced this action on October 18, 1995 seeking damages pursuant to 42 U.S.C. § 1983 on the

2. Det. Charles testified that he had never refused a request by DCPI to do a perp walk, but that there is a procedure for such a refusal if to do so could hinder the prosecution's case. (Deposition of Det. Charles "Charles Dep." at 49.) Det. Charles also testified that he had only done six or seven such walks. (Charles Dep. at 48.)

3. Plaintiff's Rule 56.1 Statements on these matters are unclear, poorly drafted, and, at times, contradictory. For instance, defendants state in Defs.' 56.1 ¶ 57 that "Detective Charles walked plaintiff out of the precinct, drove him in an unmarked car around the police station, and brought him back inside the precinct." Plaintiff's Opposing Rule 56.1 Statement states in response that plaintiff denies the matter set forth by Defs.' 56.1 ¶ 57. However, plaintiff's own Rule 56.1 Statement states ¶ 53 that Det. Charles "walked plaintiff out of the precinct, down the stairs, and out the front door, put him into an unmarked car and drove him around the block." Plaintiff's Rule 56.1 Statement also lists factual allegations that are, not in any perceivable order, chronological or otherwise. (*See, e.g.*, Pl.'s 56.1 ¶¶ 14, 15, 19, 60, 61, and also ¶¶ 21, 53). Further complicating matters is the fact that plaintiff's memorandum of law states as facts naked allegations, without citing to depositions, affidavits, or any other items in the record, seemingly in violation of Local Rule 7.1. We have, however, accepted these submissions for filing.

4. Plaintiff's Rule 56.1 statement asserts that the perp walk footage was shown on all three *Fox 5 News* broadcasts. It appears from the evidence submitted, however, that the perp walk footage may only have been shown on the two September 29, 1995 broadcasts. (Plaintiff's Exhibits R, S.)

grounds that defendants deprived him of rights secured to him by (1) the Fourth and Fourteenth Amendments to the United States Constitution, (2) the Sixth and Fourteenth Amendments to the United States Constitution, (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and (4) the Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff further alleges numerous violations of New York state law in connection with the same events.

## DISCUSSION

A court may grant summary judgment if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, and all inferences and ambiguities are resolved in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). The moving party "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." *Id.* at 1223–24. Because there are no material issues of fact remaining in this case with regard to liability, summary judgment is appropriate.

### I. FEDERAL CLAIMS PURSUANT TO 42 U.S.C. § 1983 (AND RELATED STATE CLAIMS).

Title 42, Section 1983 of the United States Code ("Section 1983" or " § 1983") provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 imposes liability "for conduct which subjects, or causes to be subjected the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Plaintiff's § 1983 claims rest on the grounds that defendants' actions deprived him of rights secured to him by the Fourth, Sixth, Eighth, and Fourteenth Amendments.

### A. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS RELATING TO PLAINTIFF'S INITIAL ARREST AND DETENTION.

#### 1. Plaintiff's Fourth Amendment Rights Were Not Violated During The Encounter at His Home in New Jersey.

■ Plaintiff asserts that he is entitled to relief under § 1983 because the officers, during the encounter at plaintiff's New Jersey home, violated rights secured to him by the Fourth Amendment and New York state law.[5] The Fourth Amendment prohibits warrantless arrests at the suspect's home absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Additionally, under state law, New York police officers do not have authority to arrest individuals outside of the state of New York without a warrant for a non-petty offense unless the officer pursued the person from within the state. N.Y.Crim.

---

5. For the sake of efficiency, the claim for false arrest under New York state law will be addressed concurrently with the § 1983 false arrest claim based on the Fourth Amendment. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir.1992) ("The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law.")

Proc. Law § 140.10. However, because plaintiff voluntarily consented to travel to New York absent any threat of violence or show of force from the officers, we find that no Fourth Amendment violation occurred when plaintiff was persuaded to leave his home and travel to New York.

■ The Fourth Amendment does not act to protect an individual from all interactions with the police, but rather from "unreasonable searches and seizures." U.S. Const. Amendment IV. A false arrest claim under New York law protects individuals from essentially the same conduct. *See Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992). "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A Fourth Amendment seizure has occurred "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Hooper,* 935 F.2d 484, 491 (2d Cir.1991)(citing *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

■ Plaintiff was not "seized" at his home for the purposes of the Fourth Amendment because he accompanied the officers back to New York voluntarily. A reasonable person in plaintiff's position would not have felt that he was being compelled to accompany the officers, and would have felt free to remain in New Jersey. There was an absence of "physical force or show of authority," as required by *Terry* in order to demonstrate that an officer has "restrained the liberty of a citizen." 392 U.S. at 19 n. 16, 88 S.Ct. 1868.

Plaintiff asserts that the deception by Det. Charles with respect to the purpose of the trip to New York rendered his consent to travel to New York invalid, and resulted in a de facto seizure and arrest in New Jersey. The undisputed evidence, however, does not support plaintiff's position. Plaintiff was aware that he was free to remain in New Jersey should he so choose. Plaintiff testified that Det. Charles informed him that he did not have a warrant. (Deposition of John Lauro Jr. "Lauro Dep." at 21.) Plaintiff also testified that he was aware that Det. Charles could not arrest him in New Jersey, and that Det. Charles confirmed that fact in their conversation at his home. (Lauro Dep. at 22.) Although plaintiff may have believed that he would not be arrested in New York, he certainly realized that he could remain in New Jersey if he so wished, and that he could require the officers to return another time with a valid warrant.

Even if the facts did not so clearly illustrate the voluntary nature of plaintiff's decision, defendants' ruse, as a matter of law, would not negate the voluntariness of plaintiff's decision to accompany the officers to New York. Cases finding the Fourth Amendment to be implicated by a suspect's decision to accompany the police back to headquarters all have in common the use of physical force by the officers or threats of its use. A typical example is *Hayes v. Florida,* 470 U.S. 811, 814—815, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), where the Supreme Court found the Fourth Amendment to be applicable in the context of officers bringing a suspect to the station for fingerprinting. The Court stated that

the line is crossed when the police, without probable cause or a warrant, *forcibly remove* a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.

470 U.S. at 814—15, 105 S.Ct. 1643 (emphasis added). Another example is *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which

found a de facto arrest of a suspect who was brought to a police station for questioning but was "never informed that he was 'free to go' [and] . . . would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody."

*Hayes* and *Dunaway*, however, do "not change the rule that a voluntary trip to the police station for questioning does not implicate the Fourth Amendment." *United States v. Webster*, 750 F.2d 307, 321 (5th Cir.1984) (discussing only *Dunaway*). The police officers in *Hayes* used more than a mere ruse to convince the suspect to accompany them to the police station. "When [the suspect] expressed reluctance voluntarily to accompany them to the station for fingerprinting, one of the investigators explained that they would therefore arrest him. Petitioner . . . then 'blurted out' that he would rather go with the officers to the station than be arrested." *Hayes* 470 U.S. at 812, 105 S.Ct. 1643. Similarly, the *Dunaway* court explicitly found a direct threat of physical restraint. *Dunaway*, 442 U.S. at 212, 99 S.Ct. 2248. This is in marked contrast to the nonviolent ruse used to convince plaintiff in this case to accompany the officers to New York.

■ A non-threatening ruse is not considered to be "forcible removal" for the purposes of the Fourth Amendment. In *Jenkins v. City of New York*, No. 91 Civ. 3539(RLC), 1992 WL 147647 (S.D.N.Y. June 15, 1992), the police, investigating the theft of cable converter boxes and lacking a warrant or probable cause to arrest the suspect, lied to him, telling him that they were investigating an unrelated car accident, in order to bring him to the station to participate in a line-up. *Id.* at *8. Judge Carter stated that "there is no constitutional guarantee that a person will not be subject to a sting operation or be lured to a public place for the purpose of arrest."

*Id.* (citing *United States v. Leung*, 929 F.2d 1204, 1208 (7th Cir.1991) (ruse used to gain entry to hotel room did not offend constitution)).

■ New York law also does not find the use of a ruse to amount to a seizure or false arrest. *See, e.g., People v. Coppin*, 202 A.D.2d 279, 608 N.Y.S.2d 661, 662 (1st Dep't 1994) (female officer arrested defendant in hallway after she "knocked on his door and suggested that she might want to go out with him"); *People v. Damiano*, 209 A.D.2d 873, 619 N.Y.S.2d 214, 215 (3rd Dep't 1994) (investigators told defendant that they wanted him to try to make an identification from a photographic array regarding an assault in which he was the complainant); *People v. Roe*, 136 A.D.2d 140, 525 N.Y.S.2d 966, 967–68 (3rd Dep't 1988) (plainclothes officer lured defendant from home on pretext that she had encountered car trouble).

Plaintiff's attempt to avoid this result by citing *People v. Fernandez*, 158 Misc.2d 165, 599 N.Y.S.2d 405 (Sup.Ct.1993) and *People v. Chin*,[6] is unavailing. The court in *Fernandez* suppressed evidence obtained after the defendant had been arrested without a warrant outside his home, finding that the tactics used by the officers negated the voluntariness of his decision to exit his home. *Fernandez*, 599 N.Y.S.2d at 409. However, the officers in *Fernandez* used just the type of force and state authority as in *Hayes* and *Dunaway*, and which is absent here. The *Fernandez* officers asserted (falsely) that they were parole officers, and that they were doing a "residence check" on the plaintiff, the permissibility of which was a condition of his parole. *Id.* Because "Fernandez was a parolee, a failure on his part to comply with the terms and conditions of his parole would constitute grounds for the revocation of his parole and return to a correctional facility." *Id.* at 409–10. The *Fer-*

---

**6.** This otherwise unreported 1987 Queens County case was reported in the New York Law Journal, December 28, 1987 at 14 col. 1.

*nandez* court's finding of a Fourth Amendment violation rested specifically on a finding that the defendant, in effect, had been *"forcibly* pulled from the threshold of his apartment" by the officers. *Id.* at 409 n. 5 (emphasis added). To the extent that the unreported 1987 case of *People v. Chin* is inconsistent with the conclusion that the use or threatened use of force is required in order to support a claim of false arrest under New York law, it must be considered contrary to established law and overruled by the later New York cases.[7]

Because plaintiff accompanied Det. Charles voluntarily to New York, and because the use of a non-threatening ruse to lure plaintiff to New York does not offend the constitution nor result in a false arrest, we hold that plaintiff's Fourth Amendment rights were not violated at his home in New Jersey.

## 2. Plaintiff's Rights Were Not Violated by His Arrest Upon Reaching New York

### a. Plaintiff's Fourth Amendment Rights Were Not Violated Because the Officers Had Probable Cause to Arrest Him.

Plaintiff contends that his arrest in New York was unlawful. A plaintiff asserting a cause of action for false arrest in violation of the Fourth Amendment to the United States Constitution must demonstrate that he was arrested without probable cause. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (citing *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)). Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Defendant need not demon-

strate either "a prima facie showing of criminal activity" nor that it is "more probable than not that a crime has been committed." *Thomas v. Culberg,* 741 F.Supp. 77, 80 (S.D.N.Y.1990) (citations omitted). Additionally, in assessing whether probable cause to arrest existed at the time of arrest, the court must "consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth,* 82 F.3d at 569. Whether probable cause existed is a question that may be determined as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and the knowledge of the officers. *Weyant,* 101 F.3d at 852.

Here, defendants assert that Det. Charles had probable cause to arrest plaintiff after watching the Videotape. Plaintiff answers that Det. Charles did not have probable cause because the Videotape depicted no unlawful entry and nothing actually stolen from the Eberharts' apartment. Plaintiff points out that Det. Charles believed he was arresting plaintiff for burglary, and that few of the requirements for burglary have been met in this case.

Contrary to plaintiff's view, it is irrelevant whether Det. Charles had probable cause to arrest plaintiff for burglary, because Det. Charles did have probable cause to arrest plaintiff for the crime of attempted petit larceny. If probable cause exists to arrest a suspect for a crime for which warrantless arrests are permitted, the arrest (and a subsequent search) is lawful even though "the officer did not accurately name the offense for which the arrest was made." *United States ex rel. Labelle v. Lavallee,* 517 F.2d 750, 754 (2d Cir.1975). *See also United States v. Carr,* 445 F.Supp. 1383, 1387 (D.Conn.1978) ("[T]he validity of an arrest is contingent upon whether the arresting officer actually had probable cause to arrest rather than upon whether the officer articulated the

---

7. We also note that we need not rely exclusively on this argument because plaintiff's state claims fall because of his failure to have

filed a timely notice of claim. *See* Section III, *infra.*

correct basis for the arrest"). The propriety of the arrest in this case is even more clear because attempted petit larceny is a closely related crime to burglary and was based on the same conduct at issue. *See Biddle v. Martin,* 992 F.2d 673, 676 (7th Cir.1993) ("Probable cause need not have existed for the charge for which the plaintiff was arrested, so long as probable cause existed for arrest on a closely related charge.")

The evidence on the Videotape was sufficient for Det. Charles to conclude that probable cause existed to arrest plaintiff for attempted petit larceny. Plaintiff was seen entering the Eberharts' bedroom numerous times without a water pitcher, and opening the closet and dresser drawers without permission. (Defs.' 56.1 ¶¶ 25—27; Pl. Exh. R.) He was also seen handling the contents of one of the drawers. (Defs.' 56.1 ¶ 29; Pl. Exh. R.) Additionally, it is clear from the Videotape that plaintiff spent much unauthorized time in the apartment outside the view of the camera. (Pl.Exh. R.)

When considering the facts that were available to Det. Charles "at the time of the arrest and immediately before it," this Court concludes that Det. Charles had probable cause to arrest plaintiff for attempted petit larceny, despite his failure to correctly articulate that charge. *See Lowth,* 82 F.3d at 569. The Videotape, while being absolute proof of little except that plaintiff is a curious individual, represents "reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief" that plaintiff was attempting to locate something of value in order to commit petit larceny. *See Weyant,* 101 F.3d at 852.

*b. Plaintiff's Sixth Amendment Rights Were Not Violated.*

 Plaintiff's complaint asserts that his Sixth Amendment rights were violated by Det. Charles' "requir[ing] plaintiff to accompany [him] to the police station without ever having explained to plaintiff the reason for his detention or the nature of the charges brought against him." (Complaint ¶¶ 10, 13(b).) "The notice requirements of the Sixth Amendment, like other rights provided [for] in the Amendment, are designed to enable a criminal defendant to present a full defense." *Wilson v. City of Chicago,* 707 F.Supp. 379, 382 (N.D.Ill.1989) (citations omitted). Defendants demonstrate that plaintiff voluntarily accompanied Det. Charles back to the police station, and was informed of the conduct underlying plaintiff's arrest at the police station at the time he was arrested. Defendants point out that plaintiff has failed to indicate how he may have been harmed by any delay in the filing of formal charges against him. (Defs.' Mem. at 24.) Additionally, plaintiff has not made a single argument in opposition to· defendants' motion for summary judgment on the Sixth Amendment claim in either of his Memoranda of Law. We therefore agree with defendants that summary judgment must be awarded in their favor on the Sixth Amendment claim.

### B. PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT BECAUSE HIS FOURTH AMENDMENT RIGHTS WERE VIOLATED AS A MATTER OF LAW BY THE STAGED "PERP WALK."

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. Amendment IV. The Supreme Court has stated that

[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The perp walk conducted with plaintiff was a seizure that intruded on plaintiff's privacy interests and personal rights, and was conducted in a manner designed to cause humiliation to plaintiff with no legitimate law enforcement objective or justification. We therefore find that the seizure of plaintiff for the purposes of the perp walk was unreasonable as a matter of law and in violation of the Fourth Amendment to the United States Constitution.

 Individuals who have been lawfully arrested do not lose all Fourth Amendment protection. *See, e.g., Weber v. Dell*, 804 F.2d 796 (2d Cir.1986) (holding that a strip/body cavity search of an arrestee violated the Fourth Amendment absent reasonable suspicion that the arrestee was concealing weapons or contraband). A search or seizure conducted with the support of state power must still be "justified as reasonable under the circumstances." *Weber*, 804 F.2d at 800. Additionally, the reasonableness requirement "of the Fourth Amendment applies not only to prevent searches and seizures that would be unreasonable if conducted at all, but also to ensure reasonableness in the manner and scope of searches and seizures that are carried out ...." *Ayeni v. Mottola*, 35 F.3d 680 (2d Cir.1994).[8]

 The seizure of plaintiff and publication of his image during the staged perp walk invades plaintiff's privacy interests in a manner that is recognized as meaningful throughout Fourth Amendment jurisprudence. First, plaintiff's control over his own body was curtailed significantly as he was handcuffed and paraded outside of the precinct. In *Terry v. Ohio*, the Supreme Court took into consideration very similar personal interests, in the context of a stop and frisk of a citizen, noting that it was

simply fantastic to urge that such a procedure [the stop and frisk] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.

392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The perp walk that plaintiff was required to perform was even more humiliating and damaging to his personal dignity than the stop and frisk discussed in *Terry v. Ohio*. Plaintiff was forcibly handcuffed, walked by Detective Charles outside of the precinct, down the stairs, out the front door, placed into an unmarked car, driven around the block, and walked back into the precinct. (Pl.'s 56.1 ¶¶ 21, 53; Defs.' 56.1 ¶ 57.) Plaintiff also stated in his deposition that he was "paraded around" and "dragged" by the arm so that Det. Charles could "fix his tie looking at the camera." (Lauro Dep. at 59, 61.) In addition to the indignity of the walk itself is the fact that the police were aware that the walk was to be featured on the *Fox 5 News* and exposed to the entire New York metropolitan area. All this in a nation where an accused is presumed to be innocent until proven otherwise.

 In addition to the violation of plaintiff's person, intangibles such as plaintiff's own image and the sound of his voice were also seized by defendants in a manner that implicates the Fourth Amendment. Voice and sound recordings of an individual are interests that are protected by the Fourth Amendment under current case law. *See Ayeni*, 35 F.3d at 688 (un-

---

8. We need not address the issue of whether the perp walk should be viewed as a seizure independent of plaintiff's arrest for Fourth Amendment purposes. We could view the perp walk as either (1) a separate, unreasonable seizure that occurred when plaintiff was forcibly removed from the station and brought back in, or (2) an unreasonable continuation and aggravation of the seizure that occurred when plaintiff was arrested. Under either analysis, the result remains the same.

reasonable recording of video and sound); *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (unreasonable recording of oral statements made on the telephone). In *Ayeni,* the Second Circuit found it unreasonable for the police to bring the press along with them during a search of the plaintiff's home when the purpose was only to "permit public broadcast of their private premises and thus to magnify needlessly the impairment of their right to privacy." 35 F.3d at 686. In so holding, the *Ayeni* court noted that "[t]he protection of privacy from encroachment by government officers is the 'principal object of the [Fourth] Amendment.'" *Id.* at 684 (citations omitted). Although the *Ayeni* court put much emphasis on the fact that the videotape was of the home, it also explicitly objected to the fact that images and sounds of "the Ayenis themselves [were taken] that were intended for public viewing by television audiences across the country." *Id.* at 688.

Having established that the perp walk did affect important interests of plaintiff that are protected by the Fourth Amendment, we next examine whether there was any legitimate law enforcement objective or justification for this infringement of plaintiff's privacy interests. In fact, there was none, making the distastefulness of the perp walk all the more apparent. Nowhere in defendants' memoranda of law do they assert any legitimate law enforcement objective. Indeed, it is difficult to imagine what possible law enforcement purpose could be served by taking an individual out of police custody, driving him around the block, and bringing him back into the po-

lice precinct. *Cf. Ayeni,* 35 F.3d at 687 ("[The officer] does not contend that CBS was assisting [him] or any of the other officers in conducting the search. On the contrary, the officers were assisting CBS in producing a television show").

The publication of plaintiff's arrest by means of the perp walk had the effect only of humiliating plaintiff, assisting the media in sensationalizing the facts of his case, and allowing Det. Charles to appear on television. None of these effects qualifies as a legitimate interest of law enforcement officers—whose legal obligation is not to provide titillating entertainment to the public but rather to enforce the laws of the state in a meaningful and prudent manner.[9] The impropriety of this action directly is demonstrated by the *Ayeni* decision:

> The video and sound recordings were unnecessary to the purposes of the search ... the government makes no claim that the search was being videotaped for legitimate law enforcement purposes ... instead, the purpose of the TV news crew's intrusion into the Ayeni home was to seize images and sounds of the Ayeni home, and of the Ayenis themselves, that were intended for public viewing by television audiences across the country ... [T]he video and sound recordings were "seizures" under the Fourth Amendment, and rendered the search far more intrusive than it needed to be.

35 F.3d at 688. Similar reasoning applies with regard to the unreasonable and unnecessarily intrusive seizure conducted on plaintiff when his seizure for the purpose

---

9. The police department could theoretically argue that the perp walk in this case was intended to "ensure the right of the public to be informed and to facilitate the accurate, timely and proper dissemination of information concerning the official business of the Department." *See* Section of New York City Police Department Patrol Guide on Release of Information to News Media (Plaintiff's Exhibit 4.) We do not address whether this is a legitimate law enforcement objective because (1) defendants have not raised the issue in

their papers, and (2) this Court is convinced beyond doubt that the perp walk procedure is not designed nor intended for the purpose of information dissemination, but rather for the purposes of incident dramatization and arrestee humiliation. The procedure is excessively harsh on the arrestee, and furthers the goal of information dissemination no more effectively than other more conventional and less intrusive methods that have been permitted by the courts.

of arrest was exacerbated needlessly by the staged perp walk conducted by Det. Charles.

This case can also be analogized to *Turner v. Safley*, which dealt with the constitutional rights of incarcerated prisoners. The Supreme Court stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). There must be "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it . . . moreover, the government objective must be a legitimate and neutral one." *Id.* at 90, 107 S.Ct. 2254. We do not here address whether a pretrial arrestee is subject to the standard that *Turner* creates for prisoners in enforcing their constitutional rights, but conclude that the perp walk at issue here, lacking any legitimate law enforcement objective, fails even this basic test of constitutionality.

■■■ We therefore hold that plaintiff's rights under the Fourth Amendment were violated by defendants as a matter of law by the perp walk conducted by Det.

Charles.[10] This outrageous and unnecessarily humiliating procedure is an "unreasonable seizure" as a matter of law and defendants have violated rights of plaintiff that are secured to him by the Fourth Amendment to the United States Constitution.[11]

## C. REMAINING FEDERAL CLAIMS

### 1. Defendants Are Entitled to Summary Judgment With Respect to Claims Based on the Eighth Amendment

Defendants, in moving for summary judgment on the Eighth Amendment claim, assert that a stipulation has been signed dismissing that claim. (Defendant's Memorandum of Law at 2 n. 2.) The Court has received no evidence of this. However, because (1) plaintiff has failed to dispute defendants' assertion regarding the stipulation or argue their Eighth Amendment claim on the merits, and (2) the evidence in this case illustrates that no Eighth Amendment claim is viable, we award summary judgment in favor of defendants. The embarrassment and humiliation suffered by plaintiff during the perp walk, although unreasonable and shocking in many ways, do not reach the extremely

**10.** Because we find that the perp walk violated plaintiff's rights as secured by the Fourth Amendment and that plaintiff is entitled to damages, we need not decide whether this procedure also violated plaintiff's Fourteenth Amendment due process rights. We also note that plaintiff's memoranda of law concentrate principally on the alleged Fourth Amendment violation, although defendants have attempted to portray the case as solely a Fourteenth Amendment issue.

**11.** We do not here address whether *Fox 5 News* or the Fox Broadcasting Company (*See* Plaintiff's Exhibit 6.) could also be held liable for the constitutional violation discussed herein. "It is well established that private persons may act 'under color' of state law, and hence be held liable under section 1983 when they act in conspiracy with state officials." *Archer Gardens, Ltd. v. Brooklyn Center Development Corporation*, 468 F.Supp. 609, 613 (S.D.N.Y.1979) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). A private actor is un-

derstood to have acted under color of law for the purposes of § 1983 if "he has conspired with state officials, that is, that he 'somehow reached an understanding' with state officials, or was a 'willing participant in joint activity with the State or its agents.' " *D'Agostino, Sr. v. New York State Liquor Authority*, 913 F.Supp. 757 (W.D.N.Y.1996) (citing *Adickes*, 398 U.S. at 152, 90 S.Ct. 1598). *See also Berger v. Hanlon*, 129 F.3d 505, 514 (9th Cir.1997) (deciding whether CNN should be liable for participating in an alleged Fourth Amendment violation by videotaping a jointly-planned search of the plaintiffs' property), *cert. granted,* —— U.S. ——, 119 S.Ct. 443, 142 L.Ed.2d 398 (1998). We note that such a claim would not be farfetched in this case given that *Fox 5 News* appears to have encouraged, and participated in, the perp walk conducted by Det. Charles. Additionally, as in *Berger*, it is unlikely that the police would have undertaken the actions discussed herein absent the participation, encouragement, and aid of the press.

high standard required for the purposes of the Eighth Amendment. The Eighth Amendment's prohibition on cruel and unusual punishment generally requires pain and suffering of a more physical nature. *See e.g., Demata v. Greifinger,* No. 96 Civ. 823(JSM), 1999 WL 47241, *2 (S.D.N.Y. February 3, 1999) ("To state a claim for cruel and unusual punishment under the Eighth Amendment, plaintiff 'must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'") (citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). *See also Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (finding that the Eighth Amendment prohibits the use of force that is "repugnant to the conscience of mankind.") No such harm occurred here.

## 2. Defendants Are Entitled to Summary Judgment on the Malicious Prosecution Claims.

■ The elements of a New York state law claim and a federal § 1983 claim for malicious prosecution are essentially identical. *Dukes v. City of New York,* 879 F.Supp. 335, 341 (S.D.N.Y.1995). Both causes of actions require that the proceeding be terminated in favor of the accused. *See id.* at 341; *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). Absent an acquittal, a prosecution is deemed to have terminated in favor of the accused "only when its final

disposition is such as to indicate the innocence of the accused." *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997).

■ At least some aspects of plaintiff's criminal proceeding terminated with an adjournment in contemplation of dismissal.[12] Under New York law, an adjournment in contemplation of dismissal is not considered favorable termination for the purposes of a malicious prosecution claim. *See Murphy,* 118 F.3d at 949 (citing *Hollender v. Trump Village Cooperative, Inc.,* 58 N.Y.2d 420, 461 N.Y.S.2d 765, 448 N.E.2d 432 (1983)). *See also Singleton v. City of New York,* 632 F.2d 185, 194 (2d Cir.1980) ("If an adjournment in contemplation of dismissal were held to be a result favorable to the defendant for purposes of bringing an action for malicious prosecution, fewer prosecutors would be willing to consent to such adjournments.") Plaintiff's federal and state malicious prosecution claims therefore must fail.[13]

## D. IMMUNITY

### 1. The City of New York Is Liable For the Fourth Amendment Violation.

■ "In order to hold a municipality liable under § 1983 for the conduct of employees below the policymaking level, a plaintiff 'must show that the violation of his constitutional rights resulted from a municipal custom or policy.'" *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) (citing *Ricciuti v. New York City*

---

**12.** The following facts, as related by Defs.' 56.1 Statement ¶¶ 62—64, were established by direct documentary evidence by defendants. (Defs.' Exhibits J, K, L, M, N; Pl.'s Exhibit 8). On September 19, 1995, plaintiff was released from custody and arraigned on the charge of a violation of New York Penal Law §§ 110.00 and 155.25, attempted petit larceny. On September 27, 1995, the criminal proceeding was adjourned in contemplation of dismissal pursuant to N.Y.Crim. Proc. Law § 170.55. Plaintiff was ordered to perform one day of community service. The charge was dismissed on March 25, 1996. In an affirmation dated November 30, 1998, plaintiff's attorney attempts to dispute this chain of events with his vague personal recollection of what had occurred on September 25, 1995, including

what he believed was a "conditional discharge." (November 30, 1998 Affidavit of Philip Dinhofer, Esq.) Because plaintiff's recollection is far from exact, because the information provided in his affirmation is not inconsistent with the events as described by defendants, and because of the more than adequate documentary evidence submitted by defendants, the Court finds that the events in question occurred as set forth in defendants' Rule 56.1 statement ¶¶ 62—64.

**13.** Apparently conceding this point, plaintiff does not even argue in either of his memoranda of law that his malicious prosecution claim should survive summary judgment.

*Transit Authority*, 941 F.2d 119, 122 (2d Cir.1991)). *See also Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff may show a municipal custom by showing facts that tend to circumstantially support such an inference. *Dwares*, 985 F.2d at 100. In this case, the evidence overwhelmingly points to the existence of a custom or policy of the City of New York that caused plaintiff's rights to be violated.

■ Det. Charles' testimony strongly supports the existence of a custom and policy of condoning, if not encouraging, the use of perp walks. Det. Charles testified that the news media had requested "what's called a walk," illustrating a familiarity with the procedure. (Charles Dep. at 46.) He testified that accommodating the press and performing a perp walk "happens all the time." (*Id.* at 47.) He elaborated: "it wasn't up to me to judge. They tell us they want a walk, we give them a walk." (*Id.* at 48.) According to Det. Charles, he was "basically" following orders, and was "not going to argue with them." (*Id.*) He testified that there was a specific procedure for denying a perp walk, if it might hurt the prosecution's case. (*Id.* at 48–49.) He himself had performed six or seven perp walks as of his deposition, and is not aware of any being denied. (*Id.*) Det. Ryan also testified to a familiarity with the perp walk procedure, discussing it as a commonly practiced police procedure. (Deposition of Thomas Ryan at 44—48.)

It is true that plaintiff failed to present direct evidence of a written city policy on

perp walks. However, "[t]he spirit and the reality of *Monell* make municipalities and their public officials liable for unconstitutional policies they enforce or *customs they condone.*" *Webster v. City of Houston*, 735 F.2d 838, 855 (5th Cir.1984) (emphasis added). *See also Clayton v. City of New York*, 596 F.Supp. 355, 361 (S.D.N.Y. 1984) (finding liability if plaintiff could "show that the City had a policy or custom, officially or unofficially, condoning the unconstitutional acts of its employees"); *Murphy v. Neuberger*, No. 94 Civ. 7421(AGS), 1996 WL 442797, *9 (S.D.N.Y. August 6, 1996) ("A municipal policy may be inferred from the informal acts or omissions of supervisory officials, even though the policy 'has not received formal approval through the body's official decision making channels.'") (citing *Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir.1980) (quoting *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018)).

Defendants have not presented any evidence contradicting Det. Charles' testimony, nor do they effectively dispute its sufficiency in their memoranda of law.[14] We find that the City of New York condoned and encouraged the perp walk conducted by Det. Charles in this case, and therefore find the City liable under § 1983 for depriving plaintiff of his Fourth Amendment rights under color of law.

*2. Detective Charles is Not Entitled to Qualified Immunity With Respect to the Fourth Amendment Violation.*

Defendants assert that Det. Charles, a government official, is entitled to qualified immunity with respect to plaintiff's Fourth

---

**14.** At a pre-motion conference, the Assistant Corporation Counsel conceded that perp walks have been routinely performed by members of the New York City police department dating back many years. Perp walks are apparently common practice in the United States:

Criminologists say the practice of walking suspects before the media started more than a century ago when investigators realized that "parading a criminal before a cameraman's lens is a way of achieving public support for policing programs," according to Robert McCrie, a professor of

security management at the John Jay School of Criminal Justice in New York. "It also serves a public desire for titillation," McCrie said. "Society hates crime and hates criminals, abhors them. When we see that someone has been apprehended . . . looking forlorn and beshackled, it indicates that the system is working, and that the defendant will get his just desserts."

*See* Andrew Martin, *Facing the Music: Ritual of the Accused's 'Perp Walk' Feeds the Public Thirst For Justice*, Chicago Tribune, July 14, 1997, at 1.

Amendment claims because his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We reject that contention, and specifically find that plaintiff's Fourth Amendment rights were clearly established by precedent.

 Although there is no reported decision that expressly forbids the use of perp walks, the Second Circuit decision in *Ayeni* put all reasonable police officers on notice that making use of state resources and police force solely to aid the press in sensationalizing and humiliating a criminal suspect at the expense of the suspect's privacy rights, without any legitimate law enforcement interest, is constitutionally unacceptable. *Cf. Ayeni*, 35 F.3d at 686 (holding that the Fourth Amendment rights recognized in that case were clearly established by prior precedent even though "there [was] no reported decision that expressly forb[ade]" the offensive conduct at issue). Although the search in *Ayeni* took place in a private home, the court notes the fact that images were taken of the Ayenis themselves. *Ayeni*, 35 F.3d at 688. The *Ayeni* court's explicit recognition of the importance of being free from unjustifiably intrusive video and sound recordings, in addition to the long line of cases such as *Terry v. Ohio* that emphasize the important rights at stake when an officer manipulates and controls the body of a suspect, clearly established that the seizure of plaintiff by Det. Charles for the sole purpose of conducting a staged perp walk is unconstitutional.

*3. The Police Department is not a Suable Entity.*

 Plaintiff includes the New York City Police Department as a defendant in

this action. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. Charter § 396. The City of New York is entitled to choose to have any suit brought against it and its agencies to be brought in the name of the city. *Bernier v. N.Y.C.D.O.C.*, No. 96 Civ. 7752(HB), 1997 WL 639028 (S.D.N.Y. Oct.15, 1997). The Police Department, an agency of the City of New York, *see* N.Y. City Charter § 431, is therefore not a suable entity, and all claims against it must be dismissed.[15]

## III. THE REMAINING STATE CLAIMS MUST BE DISMISSED BECAUSE PLAINTIFF NEGLECTED TO FILE A NOTICE OF CLAIM.

New York law requires that, prior to initiating an action in tort against a municipality, a notice of claim be filed within ninety days after the claim has arisen. N.Y. Gen. Mun. Law §§ 50–e(1)(a) and 50–i(1). A notice of claim must also be served on a municipal employee prior to a suit in tort against him or her if the municipality has a statutory obligation to indemnify the employee. *See* N.Y. Gen. Mun. Law § 50e(1)(b); *D'Angelo v. City of New York*, 929 F.Supp. 129, 135 (S.D.N.Y.1996). New York City is required to indemnify Det. Charles if he is held liable for a claim as to which "the act or omission ... occurred while [he] was acting within the scope of his public employment ...." N.Y. Gen. Mun. Law § 50–k(3).

 A notice of claim was required to be served on Det. Charles because he was

---

**15.** Plaintiff asserts that defendants have waived this defense, relying on *Rubino v. City of New York*, 145 A.D.2d 285, 538 N.Y.S.2d 547 (1st Dep't 1989). In *Rubino*, the court found that a defendant could not assert personal jurisdiction or statute of limitations defenses after informally appearing in the ac-

tion. *Id.* However, the New York C.P.L.R., although providing that the defenses of personal jurisdiction and statute of limitations must be affirmatively pled or will be deemed waived, contains no such provision with respect to a defense that the entity is not suable. *See* N.Y. C.P.L.R. § 3211.

acting within the scope of his employment when he conducted the perp walk of plaintiff. Plaintiff in his complaint asserts that Det. Charles was "acting in his regular and official employment as a police officer for the City of New York." (Complaint ¶ 8.) Defendants admitted this in their answer. (Answer ¶ 8.) Further, Det. Charles' deposition made it clear that he was acting pursuant to the directives of DCPI and common police department practice. There is no reason to doubt that Det. Charles was acting in accordance with common police practice and pursuant to his role as a New York City police officer when he conducted the perp walk at issue in this case.

■ It is irrelevant that defendants failed to plead the notice of claim defect in their answer. "[W]hen a notice of claim requirement is statutorily imposed it is usually deemed an element of the substantive cause of action and as such its satisfaction must be pleaded in the *complaint*." *Fratto v. Western Regional Off–Track Betting Corp.*, 147 Misc.2d 577, 557 N.Y.S.2d 255, 258 (Sup.Ct.1990) (emphasis added). That the plaintiff has failed to state a claim need not be asserted as an affirmative defense. *Id.* at 257. Defendants may therefore now assert that plaintiff's state causes of action must fall for his failure to have filed a notice of claim.

Plaintiff does not contend that he has filed a notice of claim. Instead, plaintiff notes that the City erroneously sent out a notice of claim acknowledgment letter, which he asserts led him to believe that the City "was accepting service of the Complaint as the equivalent of a notice of claim in satisfaction of the requirement." (Plaintiff's Memorandum of Law at 36.) Plaintiff does not cite any case supporting his position. Further, the Court is doubtful that plaintiff was truly misled. The letter itself does not specifically state that a notice of claim has been filed, but rather that "receipt is hereby acknowledged of your claim against the City of New York." (Defs.' Exhibit O–2.)

■ The fact that plaintiff never filed a notice of claim in this action is dispositive. "A federal court lacks the jurisdiction to waive the notice requirements of Gen. Mun. Law §§ 50–e and 50–i or to grant leave to file a late notice of claims for pendent state tort claims." *Roberts v. New York City Dep't of Corrections*, No. 96 Civ. 3210, 1998 WL 391815 (E.D.N.Y. April 30, 1998) (citing N.Y. Gen. Mun. Law § 50–e(7)); *Brown v. Metropolitan Transportation Authority*, 717 F.Supp. 257, 260 (S.D.N.Y.1989). Further, even if this Court did have jurisdiction, plaintiff has manifestly failed in his burden to demonstrate either compliance with the notice of claim requirement or legal authority for its waiver. Plaintiff's remaining state causes of action must therefore be dismissed.[16]

## CONCLUSION

For the foregoing reasons,

(1) Plaintiff's motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on the issue of liability is

 (a) GRANTED with respect to defendants' liability under the Fourth Amendment § 1983 claim arising out of the perp walk; and

 (b) DENIED with respect to all other claims;

(2) Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is

 (a) DENIED with respect to defendants' liability under the Fourth Amendment § 1983 claim arising out of the perp walk; and

 (b) GRANTED with respect to all other claims.

SO ORDERED.

---

**16.** We therefore have no cause to rule on whether Det. Charles is absolutely immune to liability under New York state law for the state law causes of action.